UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| TREVOR SINGLETON, individually and on behalf of all others similarly situated, | § § § | |
| *Plaintiff,* | § § | Case No.: 5:15-CV-0474 (BKS/TWD) |
| vs. | § § | |
| FIFTH GENERATION, INC., d/b/a TITO'S HANDMADE VODKA, | § § § § | Judge Brenda K. Sannes Magistrate Judge Terese Wiley Dancks |
| *Defendant.* | § § | |

**DEFENDANT FIFTH GENERATION, INC.'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION**

Ricky L. Shackelford*
California Bar No. 151262
GREENBERG TRAURIG, LLP
1840 Century Park East, Suite 1900
Los Angeles, California 90067
Phone Number: 310-586-7700
Fax Number: 310-586-7800
shackelford@gtlaw.com

David L. Nocilly (Bar No. 510759)
BOND SCHOENECK & KING, PLLC
One Lincoln Center
Syracuse, New York 13202
Phone Number: 315-218-8000
Fax Number: 315-218-8100
dnocillly@bsk.com

Marcy Hogan Greer*
Texas Bar No. 08417650
ALEXANDER DUBOSE JEFFERSON & TOWNSEND LLP
515 Congress Ave., Suite 2350
Austin, Texas 78701
Phone Number:  512-482-9300
Fax Number:  512-482-9303
mgreer@adjtlaw.com

ATTORNEYS FOR DEFENDANT FIFTH GENERATION, INC.

*admitted pro hac vice

### TABLE OF CONTENTS

Table of Contents ...................................................................................................... i

Index of Authorities ................................................................................................ iii

Introduction ............................................................................................................. 1

Factual Background ................................................................................................. 2

    A.    History of Tito's Handmade Vodka .............................................................. 2

    B.    Singleton First Encounters Tito's Handmade Vodka in a Restaurant
          Kitchen ........................................................................................................ 5

    C.    Singleton Files This Suit ............................................................................. 8

Argument and Authorities ....................................................................................... 8

I.    The Standards for Class Certification Are Rigorous and Demanding, Not
    Presumed .......................................................................................................... 8

II.    There Is No Common Experience for the Class ............................................... 9

    A.    The Section 349 Claims Will Require Individualized Answers and Proof ........ 10

          1.    Whether the Label Is Deceptive or Misleading in a Material Way
               Is an Uncommon Question ...................................................................... 11

               a.    "Handmade" is in the eye of the beholder ................................. 12

               b.    "Crafted in an old-fashioned pot still" is entirely accurate .......... 14

               c.    Perceptions of "quality" are highly individualized ..................... 16

          2.    Causation Can Only Be Demonstrated on a Case-by-Case Basis ............ 17

          3.    There Is No Evidence of a Price-Premium Injury, Much Less a
             "Common" One ...................................................................................... 19

    B.    The Intentional Misrepresentation Claim Fails to Satisfy Rule 23 .................... 23

III.    Singleton Is Neither Typical of Nor Adequate to Represent the Class ............................ 23

IV.    A Class Action Would Not Be Superior to Other Resolutions ....................................... 24

V.    Injunctive Relief Is Not Appropriate .............................................................. 24

VI.    The Proposed Class Definition Is Improper ...................................................... 25

Prayer ................................................................................................................................. 25

INDEX OF AUTHORITIES

## Cases

*Amchem Prods., Inc. v. Windsor,*
   521 U.S. 591 (1997)................................................................................10

*Amgen v. Conn. Ret. Plans & Trust Funds,*
   568 U.S. 455, 133 S. Ct. 1184 (2013)......................................................9

*Avon Anti–Aging Skincare Creams & Products Mktg. & Sales Practices Litig.,*
   13–CV–150, 2015 WL 5730022 (S.D.N.Y. Sept. 30, 2015)....................25

*B & M Linen,*
   679 F. Supp. 2d 474 (S.D.N.Y. 2010).....................................................25

*Barrett v. Milwaukee Elec. Tool, Inc.,*
   No. 14-CV-1804 JAH (DHB), 2016 WL 4595947 (S.D. Cal. Jan. 26, 2016) ........................2

*Byrd v. Aaron's, Inc.,*
   784 F.3d 154 (3d Cir. 2015).....................................................................25

*Comcast Corp. v. Behrend,*
   133 S. Ct. 1426 (2013)...........................................................2, 8, 9, 10, 19, 23

*Delgado v. Ocwen Loan Servicing, LLC,*
   No. 13-CV-4427 (NGG) (RML), 2014 WL 4773991 (E.D.N.Y. Sept. 24,
   2014) .........................................................................................................19

*Gen. Tel. Co. of Sw. v. Falcon,*
   457 U.S. 147 (1982)..............................................................................9, 24

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.,*
   317 F.R.D. 388 (E.D.N.Y. 2016).............................................................10

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.,*
   8 F. Supp. 3d 467 (S.D.N.Y. 2014).....................................................10, 17

*Hughes v. The Ester C Co.,*
   317 F.R.D. 33 (E.D.N.Y. 2016)...............................................................25

*In re Initial Pub. Offerings Sec. Litig.,*
   471 F.3d 24 (2d Cir. 2006)........................................................................9

*Karhu v. Vital Pharms., Inc.,*
   No. 14-11648, 2015 WL 3560722 (11th Cir. June 9, 2015)....................25

*Marcus v. BMW of North Am., LLC,*
   687 F.3d 583 (3d Cir. 2012).......................................................................5

*Mazzei v. Money Store,*
  829 F.3d 260 (2d Cir. 2016)..................................................................................23

*Nowrouzi v. Maker's Mark Distillery,*
  Case No. 14-CV-2885-JAH, 2015 WL 4523551 (S.D. Cal. July 27, 2015)...........................12

*Orlander v. Staples, Inc.,*
  802 F.3d 289 (2d Cir. 2015)..............................................................................10, 19

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, N.A.,
  85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995)........................................10

*Pye v. Fifth Generation, Inc.,*
  Case No. 4:14cv493-RH, 2015 WL 5634600 (N.D. Fla. Sept. 24, 2015) ...............................12

*Salters v. Beam Suntory, Inc.,*
  No. 4:14-cv-659-RH-CAS, 2015 WL 2124939 (N.D. Fla. May 1, 2015).............................12

*Servedio v. State Farm Ins. Co.,*
  889 F. Supp. 2d 450 (E.D.N.Y. 2012) ....................................................................19

*Small v. Lorillard Tobacco Co.,*
  720 N.E.2d 892 (N.Y. 1999)..............................................................................19

*Stutman v. Chem. Bank,*
  95 N.Y.S.2d 24 (N.Y. Ct. App. 2000) ....................................................................19

*Tyson Foods, Inc. v. Bouaphakeo,*
  136 S. Ct. 1036..............................................................................................9

*Wal-Mart Stores, Inc. v. Dukes,*
  564 U.S. 338, 131 S. Ct. 2541 (2011)....................................................8, 9, 12, 24

*Wawszkiewicz v. Dep't of Treasury,*
  670 F.2d 296 (D.C. Cir. 1981)............................................................................4

*Weiner v. Snapple Beverage Corp.,*
  07 CIV. 8742, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010)......................................25

*Welk v. Beam Suntory Co.,*
  Case No. 15-CV-328 (LAB), 2013 WL 5022527 (S.D. Cal. Aug. 21, 2015)........................12

*Wurtz v. Rawlings Co., LLC,*
  No. 12-CV-1182, 2016 WL 7174674 (E.D.N.Y. Nov. 17, 2016)..................................10

**Statutes**

27 U.S.C. § 201 ....................................................................................................4

iv

27 U.S.C. § 205(4) ............................................................................................................4

27 U.S.C. § 205(e)(1) ........................................................................................................4

**Regulations**

27 C.F.R. § 13.25-.27 .....................................................................................................24

**Other Authorities**

FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 432
    (3d ed. 2011) .......................................................................................................19

**INTRODUCTION**

Plaintiff Trevor Singleton ("Singleton") seeks to represent a class of New York consumers who purchased Tito's Handmade Vodka® manufactured by Defendant Fifth Generation, Inc. ("Fifth Generation") based on allegations that the words "handmade" and "crafted in an old-fashioned pot still" on the labels are false and misleading.  Although Singleton is correct that the labeling has been consistent during the class period—in compliance with federal regulations—his evidence shows that the claims he seeks to represent are anything but uniform.

For 20 years, Tito's Handmade Vodka has been made exclusively by Fifth Generation in its original microdistillery in Austin, Texas.  Every batch is made in old-fashioned pot stills in Austin and taste-tested by Fifth Generation's team of expert tasters before being bottled at the same facility.  As the founder's sworn testimony details, the descriptions are not misleading.  The record is conclusive that Fifth Generation exclusively owns and uses pot stills in its distillery.  And by law, the terms "handmade," "old-fashioned," and "quality" are "puffery" or opinions, not actionable in fraud.  Because these terms are purely subjective, it is not surprising that class members will have different opinions as to what handmade means, and as a well-designed survey of Tito's purchasers has revealed, only a fraction of class members have ascribed any significance to the term "handmade," and an even smaller fraction of those class members attribute handmade to process.  Of the vast majority of the purchasers surveyed who were repeat purchasers, less than four percent indicated that "handmade" was the primary reason for their purchases.

Of these 300+ Tito's Handmade Vodka customers, an overwhelming majority rejected the claim that Singleton has pled. ███████████████████████████████

███████████████████████████████████

███████████████████████████████████

███████████████████████████████████

██████████████████████████████  This information defeats any notion that the class claim is uniform.

Singleton has also failed to show that the members of his putative class share his experience.  He first encountered Tito's Handmade Vodka when his boss, a restaurant proprietor, bought it for use in the kitchen.  He was quickly won over by the taste and used it for years in his cooking.  He did not purchase the vodka based on the label and bought 1.75-liter bottles on a weekly basis for at least four years.  The evidence shows that the potential class members have had different experiences when it comes to purchasing and consuming Tito's Handmade Vodka, although a large number of them, including Singleton, have shared experiences of its smooth taste.

Although he claims an injury based on a price premium, Singleton fails to produce a shred of evidence of what the retail prices were in New York for Tito's Handmade Vodka or any other vodka.  None of his three experts is an economist and none analyzed retail sales data, and there is no economic model to substantiate the claim.  When the aggregated data is actually considered, there is no proof of a price premium for Tito's Handmade Vodka, much less one that could be attributed to the claim that "handmade" is misleading.  In any event, the only evidence of retail sales prices in New York is that they vary widely so it would not be possible to determine or calculate any price premium—even if Singleton's hypothesis were credited—without referencing each individual's purchase history.  Thus, the putative class fails to satisfy the Supreme Court's *Comcast*[1] standard that rejected theories in favor of economic analysis that matches the injury alleged.  On any and all of these bases, class certification should be denied.

**FACTUAL BACKGROUND**

**A.      History of Tito's Handmade Vodka**

Tito's Handmade Vodka is the brainchild of founder Bert Butler Beveridge II, who has

---

[1] *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432-34 (2013).

gone by "Tito" his entire life.  Beveridge formed Fifth Generation in 1995 and began distilling batches of vodka in a homemade, old-fashioned pot still, beginning production in in 1997. Beveridge I Decl. ¶¶ 1-2 (Exhibit 1).[2]  As Beveridge describes his proprietary process:



*Id.* at ¶ 2; *see also* Beveridge II Decl. ¶¶ 1-4 (Exhibit 2).  The process takes much longer than modern, automated processes, such as the more efficient, continuous distillation column still,[3] because it permits distillation of only one batch at a time.  Beveridge II Decl. ¶ 3.  And it requires

---

[2] All exhibits are attached to the Declaration of Marcy Hogan Greer, filed contemporaneously.  Singleton also submitted a copy of this declaration with his motion for class certification, but that copy lacked the attachments, so Fifth Generation is submitting the full declaration under seal.  *See* Exhibit 7 to *Declaration of Shannon L. Hopkins in Support of Plaintiff's Motion for Class Certification* (Feb. 3, 2017).

[3]

human intervention to taste each batch in order to determine how to best capture the center-cut alcohol—the "nectar"—to achieve the best and most consistent quality vodka. Beveridge I Decl. ¶¶ 2-3, 22. According to Beveridge, the process is worth it: "'handmade' has always been my opinion that the best-tasting vodka is achieved through pot-still distillation with the human-controlled, organoleptic-based methods and processes we have developed and refined at Fifth Generation, Inc." *Id.* ¶ 22.

As with all alcoholic beverages, Tito's Handmade Vodka is heavily regulated and taxed. *Id.* ¶ 4. Every bottle for sale must have a label approved by the U.S. Alcohol and Tobacco Tax and Trade Board ("TTB") before it can leave the distillery. The TTB reviews labels as part of a comprehensive statutory and regulative scheme, which approves, or in many cases, rejects, the proposed label submitted to it as part of a certificate of label approval process, or "COLA." And, under the Federal Alcohol Administration Act ("FAAA")[4] and its regulations, the Secretary of the Treasury is directed to make regulations governing alcohol labels that "prohibit deception of the consumer" and "prohibit statements on the label that are . . . false (or) misleading . . . ." 27 U.S.C. §§ 205(e)(1)&(4); *Wawszkiewicz v. Dep't of Treasury*, 670 F.2d 296, 297-98 (D.C. Cir. 1981).

The TTB does not simply review paperwork submitted to it by the manufacturers. It regularly audits the entire operation. *See e.g.* Beveridge I Decl. ¶¶ 6-7 & Exhibit 1. Audits of Fifth Generation regularly include "all phases of production, warehousing, bottling, and shipping" with the assistance of the Trade Investigations Division "in testing product integrity, labeling, proof and fill, and use of approved formulas." *Id.* TTB employees can and do request and review "accounting records and reports, operating source documents, and other data relevant to operations and proper preparation of excise tax returns," as well as "records relating to labeling, formula

---

[4] 27 U.S.C. § 201 *et seq.*

approvals, and proof and fill operation," "historical inventory records," and "physical inventories of finished goods . . . ." *Id.* The process can be lengthy—weeks at a time—involving numerous TTB employees who "camp out" at the distillery. Beveridge I Decl. ¶ 7.

The word "Handmade" has been part of the label for Fifth Generation's vodka product since the very first label approved for product sale in 1997. *Id.* ¶ 8. Fifth Generation has also used the phrase "'Made' (and since 1998) Crafted in an Old Fashioned Pot Still" under each use of Handmade on the front label to explain what made its vodka different and "handmade." *Id.*

The TTB has specifically questioned the use of "handmade" on the labels for Tito's Handmade Vodka and looked into the matter during the course of its 2005 audit and ultimately "concluded that the reference to 'handmade' on this label is [in] compliance with the labeling regulations we enforce and we do not find the term misleading." *Id.* ¶¶ 10-15 & Exhibit 8. Since that time, the TTB has approved other labeling changes, but has not questioned Fifth Generation's use of "handmade" again. *Id.* ¶¶ 17-18. More recently, the TTB's Director of the Advertising, Labeling and Formulation Division submitted a declaration in another case involving similar claims stating that the TTB had "determined that as a matter of policy, ***the term 'handmade' has no definition in the TTB regulations, nor industry standard and as such, constituted puffery, and did not conflict with or qualify any of the mandatory statements on the label.***" Scalese Decl. ¶ 4 (attached to Beveridge I Decl. as Exhibit 10) (emphasis added).

### B.   Singleton First Encounters Tito's Handmade Vodka in a Restaurant Kitchen

Singleton's first exposure to Tito's Handmade Vodka was while working as a sous chef at the Bluestone Grill. Singleton Depo. at 31:22-32:6; 34:2-13; 38:13-19 (Exhibit 3). One of the owners brought a bottle of the vodka to the restaurant and shared it with the kitchen staff, including Singleton. *Id.* at 39:1-19. Singleton testified that he liked Tito's Handmade Vodka better than Absolut, *id.* at 40:3-13, a higher priced brand. In his own words: "I just thought [Tito's] had a

better finish to it and a smoothness to it that . . . I didn't find with like Absolut or -- . . . *I guess it's a personal preference*." Singleton Depo. at 40:10-13 (emphasis added).

After that point, when preparing dishes using vodka, the kitchen staff would typically use Tito's Handmade Vodka: "At that point we all came to the consensus, meaning my chef and the owner, the other partner in the business, that it was suitable vodka to use for cooking *because of its quality and flavor*." *Id.* at 36:5-37:2. Singleton and his co-workers felt that Tito's Handmade Vodka had the best taste in the dishes they prepared. *Id.* at 38:2-12.

At that time, Singleton himself did not have responsibility for buying alcohol for the Bluestone Grill. *Id.* at 41:9-11. He had no sense how Tito's Handmade Vodka compared to other brands price-wise; instead, his boss told him "'It was a good price. . . . and it's a good tasting vodka for the price.'" *Id.* at 42:1-9. She apparently changed brands from Ketel One to Tito's Handmade Vodka "[b]ecause she liked the flavor and the price, basically, too." *Id.* at 42:10-24. Singleton added that his boss also liked "the fact that it was handmade in small batches and all that. We . . . really liked that aspect of it." *Id.* at 43:1-3. When asked what his boss communicated as to her understanding of "handmade," Singleton answered: "All that she said was it's handmade vodka. It's good quality vodka. That's basically -- I think that's all she knew. She was going off the label basically." *Id.* at 43:15-18.

Singleton was already familiar with Tito's Handmade Vodka before he made his first purchase. *Id.* at 56:12-57:8; 71:5-8. He purchased it both to cook with and to drink. *Id.* at 59:7-9. He continued to purchase exclusively Tito's Handmade Vodka for his own personal consumption. *Id.* at 60:18-21; 61:18-21. When he became the head chef at the Circle E Diner in Hancock, New York, and was able to choose the vodka used in his signature dishes, Singleton continued to use Tito's exclusively—because "I had used it at the Bluestone and it was a good vodka to use for the flavors I wanted to keep consistent." *Id.* at 47:23-49:8. He purchased Tito's

6

repeatedly over the course of seven years, and during the class period (2010-2014), he claimed he was purchasing a 1.75-liter bottle per week.  Class Action Complaint (Docket #1) ¶ 16; *see also* Singleton Depo. at 61:18-62:2.  In his experience, the price fluctuated.  *Id.* at 73:3-9.  But the quality never changed.  *Id.* at 74:4-12.  And he simply liked the flavor of Tito's Handmade Vodka over a number of other available vodkas.  Singleton Depo. at 89:4-91:1l; *see also* Plaintiff's Interrogatory Answers No. 23(f) (Exhibit 4) ("[I]t had a good flavor that was smooth and palatable.").  Although Singleton claims that Fifth Generation misrepresented its "superior quality and workmanship," Complaint ¶ 4, he testified that "quality is ***subjective.  It depends upon every person's taste***. . . . . ."  Singleton Depo. at 99:4-5 (emphasis added); *see also id.* at 93:20-23.  In Singleton's mind, quality is "[m]ostly" about taste.  *Id.* at 99:17-23.

Singleton never saw any advertising prior to his first purchase of Tito's Handmade Vodka.  *Id.* at 70:5-20.  In his own words, advertising and promotion "had no bearing on my decision to use it or not."  *Id.* at 70:19-20.  He has never visited Fifth Generation's website.  *Id.* at 71:9-12.

Although his Complaint describes a fully automated process for distilling Tito's Handmade Vodka, Singleton himself has no real understanding of the way it is actually made.  As of the time of his deposition, Singleton had not seen any videos[5] or reviewed other information that depicts the process for distilling Tito's Handmade Vodka.  *Id.* at 80:7-10.  He relied entirely on an article in *Forbes* about Tito's Handmade Vodka for his allegations about automation and mass production, although he did not actually read the article until approximately a week before his deposition.  *Id.* at 80:11-82:2; *see also* Complaint ¶ 24.  Notwithstanding his allegations, Singleton agreed that stills like those used to distill Tito's Handmade Vodka are not machines:  "It has no

---

[5] One of Singleton's experts relies heavily on a video from the Titosvodka.com website called "Tito's Story," but Singleton never saw it.  The montage of news and special-interest stories was not placed on the Tito's website until October 3, 2016—17 months after this lawsuit was filed.  Plater Decl. ¶ 5 (Exhibit 5); *see also* Yessian Decl. ¶ 5 (Exhibit 6).  Although it was available on YouTube earlier, it was viewed a total of 1,116 times between April 2012 and April 2015.  *Id.* ¶ 7.

moving parts, so it wouldn't be a machine." Singleton Depo. at 83:24-84:15. And even if the size of the pot still were increased, it would still not convert the tool into a "machine." *Id.* at 84:20-24.

Singleton considered Tito's Handmade Vodka to be reasonably priced as compared to other brands, including Absolut, Ketel One, Grey Goose, and Pinnacle, and he was not able to identify any other vodka brands that are handmade. *Id.* at 94:21-96:17. Singleton stopped purchasing vodka altogether at the time he filed this lawsuit and now drinks Jack Daniels. *Id.* at 61:22-62:9.

### C.    Singleton Files This Suit

Singleton brought this case in April, 2015. It was one of a series of similar lawsuits filed in various jurisdictions that were based in large part on some statements in the *Forbes* article. All of the other cases have been dismissed in their entirety.

Fifth Generation brought a motion to dismiss Singleton's claims here, and the Court dismissed two causes of action. *See Memorandum-Decision and Order* (Docket #32) at 33. His two remaining claims are alleged violations of New York General Business Law §349 and intentional misrepresentation.[6] *Id.* at 24, 31-33. He asks the Court to certify these two claims on behalf of a class of all persons in New York who purchased Tito's Handmade Vodka from April 12, 2012, through the present. As evidenced by Singleton's own experience, these putative claims are highly individualized and cannot be certified for class treatment.

### ARGUMENT AND AUTHORITIES

## I.    The Standards for Class Certification Are Rigorous and Demanding, Not Presumed

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349, 131 S. Ct. 2541 (2011); *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). A district court

---

[6] The Court has not yet ruled on the merits of the safe harbor defense to the plaintiff's §349 claim; it merely determined that evidence outside the pleadings of the TTB's review process would be required.

may certify a class only if after a "rigorous analysis" it finds, not merely assumes, that the plaintiffs have met their burden of demonstrating that (1) the proposed class meets all four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy of representation, and (2) that the class fulfills one of the categories of Rule 23(b).[7]  *Dukes*, 564 U.S. at 349-51; *see id.* at 351 ("'[A]ctual, not presumed, conformance with Rule 23(a) remains ... indispensable.'" (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 160 (1982)); *Amgen v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 133 S. Ct. 1184, 1191 (2013).  The "rigorous analysis" may entail overlap with the merits of the claims because it is improper to certify a class without knowing how the claims can and will likely be tried.  *Comcast*, 133 S. Ct. at 1432.  The plaintiff's burden "is not lessened by overlap between a Rule 23 requirement and a merits issue, even a merits issue that is identical with a Rule 23 requirement."  *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006).

## II.    There Is No Common Experience for the Class

A common question is one that is answered the same for all class members not reliant on individual proof.  *Dukes,* 564 U.S. at 350 ("Th[e] common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.").  An individual question is one where "members of a proposed class will need to present evidence that varies from member to member," while a common question is one where "the same evidence will suffice for each member to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."  *Tyson Foods, Inc. v. Bouaphakeo,* 136 S. Ct. 1036, 1045 (internal quotation marks omitted)).

---

[7] Singleton seeks certification under Rule 23(b)(2) based on his request for injunctive relief on behalf of the class or Rule 23(b)(3), requiring showings that common issues predominate over individual issues and that the class device is superior to other forms of resolution.

Far more demanding than Rule 23(a)'s commonality requirement is the predominance inquiry of Rule 23(b)(3). *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997); *accord Comcast*, 133 S. Ct. at 1432. Common issues predominate under Rule 23(b)(3) only when common issues will be the object of most of the efforts of the litigants and the court. The putative class claims cannot meet Rule 23(a)'s test for common questions, much less the "far more demanding" requirement of predominance.

### A.     The Section 349 Claims Will Require Individualized Answers and Proof

To state a claim under New York's General Business Law § 349(a), each plaintiff must allege and prove:  "(1) that the defendant's acts were consumer oriented, (2) that the acts or practices are 'deceptive or misleading in a material way,' and (3) that the plaintiff has been injured as a result." *Goldemberg v. Johnson & Johnson Consumer Cos.*, 8 F. Supp. 3d 467, 478 (S.D.N.Y. 2014) ("*Goldemberg I*") (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, N.A., 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995)). New York courts of appeals have adopted an "objective" definition of "misleading." *Wurtz v. Rawlings Co., LLC*, No. 12-CV-1182 (JMA)(AKT), 2016 WL 7174674, at *10 (E.D.N.Y. Nov. 17, 2016); *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015). To show that conduct is "materially misleading," the plaintiff must show the act is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *Orlander*, 802 F.3d at 300 (internal quotations and citation omitted)). The test is not whether the label can be proven false, but whether the labeling of the products is deceptive because it "would deceive a consumer." *Goldemberg v. Johnson & Johnson Consumer Cos.,* 317 F.R.D. 374, 388 (E.D.N.Y. 2016) ("*Goldemberg II*").

Fifth Generation does not dispute that its marketing and sales are "consumer oriented," but the record in this case does not support the second two elements of the claim either for Singleton or any other class member, as more fully explained in Fifth Generation's Motion for Summary

Judgment, filed contemporaneously.  In any event, the questions raised by these elements cannot be answered uniformly for the class.

### 1.    Whether the Label Is Deceptive or Misleading in a Material Way Is an Uncommon Question

Singleton alleges that Fifth Generation has promoted and advertised Tito's Handmade Vodka in a materially misleading and deceptive manner.  Complaint ¶¶ 2-3, 36.  Specifically, he claims that "[t]he conduct of Defendant alleged herein violates GBL § 349 in that Defendant engaged in the unfair acts and deceptive practices as described herein, which included the promotion and advertising of Tito's Handmade Vodka as being 'Handmade' and 'Crafted in an Old Fashioned Pot Still' which was deceptive, false and misleading given that the Vodka is actually made by mechanized and/or automated processes in massive buildings containing ten floor-to-ceiling stills."  *Id.* ¶ 44.  But, according to Singleton's deposition testimony, advertising and promotion "had no bearing on my decision to use it or not."  *Id.* at 70:19-20; 70:5-20; 71:9-12.  He first tasted Tito's Handmade Vodka in a restaurant kitchen and continued to use and consume it because his boss purchased and promoted it due to the taste and price point.  *Id.* at 39:1-19; 42:1-24.  And Singleton found he liked Tito's Handmade Vodka better than other brands, *id.* at 40:3-13; 89:4-91:1; *see id.* at 40:10-13 ("***I guess it's a personal preference***." (emphasis added)).

Singleton is not unusual in this regard.  ████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████.[8]  As explained below, this survey reveals a wide range of consumer perceptions about the putative claims that promotion and advertising of Tito's

---

[8] Approximately 24% of the respondents were from New York State.  NERA Report ¶ 40.

Handmade Vodka as being "handmade" and "crafted in an old fashioned pot still" are deceptive or misleading. These claims require individual inquiries, yielding myriad answers, and so simply cannot be resolved "in one stroke." *Dukes*, 564 U.S. at 350.

### a.   "Handmade" is in the eye of the beholder

There is no regulatory or industry definition of "handmade," much less one measured by total output. Coffey Depo. at 97:2-8 (Exhibit 8). As noted, the TTB's Director of the Advertising, Labeling and Formulation Division submitted a declaration in another case involving similar claims stating that the TTB had "determined that as a matter of policy, the term 'handmade' has no definition in the TTB regulations, nor industry standard and as such, ***constituted puffery, and did not conflict with or qualify any of the mandatory statements on the label***." Scalese Decl. ¶ 4 (attached as Exhibit 10 to Beveridge I Decl.) (emphasis added).

Courts are also in agreement that the term "handmade"—used in connection with alcohol distillation—is classic opinion or "puffery." *See, e.g., Pye v. Fifth Generation, Inc.*, Case No. 4:14cv493-RH/CAS, 2015 WL 5634600, at *2 (N.D. Fla. Sept. 23 , 2015); *Salters v. Beam Suntory, Inc.*, No. 4:14-cv-659-RH/CAS, 2015 WL 2124939, at *2-3 (N.D. Fla. May 1, 2015) (dismissing complaint with prejudice, finding with respect to a whiskey product that "no reasonable person would understand 'handmade' in this context to mean literally made by hand"); *Nowrouzi v. Maker's Mark Distillery Inc.*, Civil No. 14CV2885 JAH(NAS), 2015 WL 4523551, at *7 (S.D. Cal. July 27, 2015); *Welk v. Beam Suntory Co.*, 124 F. Supp. 3d 1039, 1043-44 (S.D. Cal. 2015); *cf. Barrett v. Milwaukee Elec. Tool, Inc.*, No. 14CV1804 JAH (DHB), 2016 WL 4595947, at *5 (S.D. Cal. Jan. 26, 2016) ("'Handcrafted' can neither be reasonably interpreted as meaning literally made by hand nor that a reasonable consumer would understand the term to mean no equipment or automated process was used to manufacture the hammers.").

12

In his deposition, Singleton's distilling expert, Donald Coffey ("Coffey"), agreed that there is no industry definition for "handmade." Coffey Depo. at 97:2-8 (Exhibit 8). He also agreed that alcohol cannot be distilled by human hands because of the boiling process, so "literally speaking," the term "handmade" does not match up with alcohol distillation. *Id.* at 125:14-22. To Coffey,

> [t]he way I would describe it for handmade, if I hear a spirit is handmade, I assume that the distiller, the person running the distillation, will start by charging his still and then he will make a personal determination on where to cut off, because I said the first thing that happens is the heads come off . . . . And somebody has to make that determination, right? So typically, in the very large GNS[9] producers, that's a very automated process because that comes off automatically. For craft distillers, there is typically somebody making a subjective determination on when to stop collecting . . . . So then it hits a certain point where it's called the heart, right. So then I decide I want to start collecting there and then I start collecting that material until it gets to a certain point where the tails start coming out. Those are typically subjective calls for the small distillers.

*Id.* at 125:23-127:5; *see id.* at 127:21-25 (confirming that his opinion of what makes a spirit "handmade" was formed by his experience in the distilled spirits industry). Coffey thus described a process of making "handmade" vodka that is precisely the one used by Fifth Generation. And Singleton, who also knows nothing about the process of making Tito's Handmade Vodka, agreed that "you can't handle boiling liquid" and "a pot still has no moving parts, so it wouldn't be a machine"—even increasing its size would not make a pot still into a "machine." Singleton Depo. at 79:5-6; 83:24-84:15, 20-24.

A NERA survey of Tito's consumers bears out just how individualized consumer understanding of the term "handmade" really is. *See generally* NERA Report. Among the respondents who indicated that "handmade" was a driver in their initial purchase decision, there was much diversity in their opinions about what "handmade" means. *Id.* ¶ 46. A number of

---

[9] GNS and NGS are both acronyms for "neutral grain spirits." Coffey Depo. at 34:13-15.

respondents "indicated that 'handmade' relates to the nature of ingredients and the overall product quality, as opposed to the nature in which the vodka was produced."  *Id.*

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████  Singleton's putative allegation is anything but common.

**b.    "Crafted in an old-fashioned pot still" is entirely accurate**

The record conclusively establishes that Tito's Handmade Vodka is distilled in pot stills, which are the only type of stills Fifth Generation owns and operates.  Beveridge II Decl. ¶ 4;

14

Littlejohn Depo. at 45:12-25 (Exhibit 16).[10]  There is no evidence to the contrary.  *See, e.g., Pye v. Fifth Generation, Inc.*, No. 4:14cv493-RH/CAS, Order Granting Summary Judgment (Docket #63) (N.D. Fla. Sept. 27, 2016) (Exhibit 9) at 4 ("What is undisputed [] is that the defendants use pot stills ….").  So Singleton's challenge to this part of the label must be to the terms "crafted" and "old-fashioned."  "Old-fashioned" is easily dispensed with—Singleton's own expert, Coffey went so far as to characterize a pot still as "old fashioned."  Coffey Depo. at 69:4-5; 125:23-127:5; *see also Pye*, Slip op. at 4-5 ("[P]ot stills can reasonably be called old-fashioned, both in absolute terms and in comparison to column stills.").

As to process, Singleton admitted he knows nothing about the actual process of distilling Tito's Handmade Vodka apart from what the label says.  Singleton Depo. at 80:7-10.  That process is a closely-held secret that is not shown on a website or any other publicly available source.  Singleton has no basis for his allegations about process other than the contents of the *Forbes* article.  *Id.* at 80:11-82:2.  By contrast, Tito Beveridge has detailed (in a document only submitted under seal) how Tito's Handmade Vodka is distilled and produced at Fifth Generation's facility.  Beveridge I Decl. ¶¶ 2-3; Beveridge II Decl. ¶¶ 1-4.  And that process unquestionably involves human participation to create Tito's Handmade Vodka.  Beveridge II Decl. ¶¶ 3-4.  Even if there were a factual basis for the claim, the perception of what "crafted in an old-fashioned pot still" means would vary greatly among class members—as demonstrated by Singleton and his expert.  *See* Singleton Depo. at 83:24-84:24; Coffey Depo. at 69:4-6 (using the adjective "old fashioned" to describe the pot still); *id.* at 125:23-127:5.

---

10

### c.       Perceptions of "quality" are highly individualized

Plaintiff also claims that Tito's labeling was misleading because it connotes a "superior product of greater quality compared to a competitor's vodka."  Complaint at ¶¶ 5, 27, 28; *see also* Singleton Depo. at 57:4-8 (Plaintiff "really liked the idea that [Tito's vodka] was handmade in small batches and stuff"); *id.* at 60:8-17 (Tito's was a favorite in part because of its "artisanship"); *Id.* at 76:24-77:3 (product with human interaction "will be superior" to a product with only machine interaction); *id.* at 83:5-14 (Plaintiff's "belief" that "handmade items are of higher quality" and were "set [] apart from other vodka").  Singleton's basic theory is that Tito's purchasers were misled into believing the vodka is "higher quality" by virtue of the way it is made, while in fact the alcohol is distilled in "massive buildings containing ten floor-to-ceiling stills and bottling 500 cases an hour."  Complaint ¶¶ 3-5.  This "process equals quality" theory has not been successful in other cases, in large part because "quality" is inherently subjective, and label claims that connote quality are non-actionable puffery.  *See, e.g.,* part II.B.1.

Singleton does not actually claim that Tito's Handmade Vodka failed to live up to his own, subjective quality expectations.  Nor could he, because according to his Complaint in this case, he bought 1.75 liters per week (one of the popular bottle sizes for Tito's Handmade Vodka) since 2010, or more than 200 bottles in all, without ever lodging a complaint.  Complaint ¶ 16.  But he has declined to provide any product to use as a benchmark for his "quality" allegations—and he testified that he is unable to identify any other brands of vodka that are handmade and so had no basis to compare it.  Singleton Depo. at 96:11-17.  In his personal opinion, the value of Tito's Handmade Vodka compared favorably to both similar and higher priced vodkas, including Absolut, Ketel One, and Grey Goose.  *Id.* at 93:23-95:8; 95:17-96:4.  But those were his opinions: "Like I said, it's kind of subjective, quality, the word."  *Id.* at 93:20-23.  Singleton's industry

expert, Coffey, agreed that "as far as 80-proof vodka is concerned, qualitative differences are really in the mouth of the drinker."  Coffey Depo. at 141:8-12.

### 2.    Causation Can Only Be Demonstrated on a Case-by-Case Basis

A plaintiff must show that he purchased defendant's product as a result of the misleading statements.  *Goldemberg I*, 8 F. Supp. 3d at 480.  "To properly allege causation, a plaintiff must state in his complaint that he has seen the misleading statements of which he complains before he came into possession of the products he purchased."  *Id.* If a plaintiff does not see the allegedly misleading information beforehand, he could not have been injured by it.  *Id.*



These survey results are further confirmed by an industry expert, Peter Reidhead ("Reidhead), who analyzed aggregated data reflecting actual purchasing behavior.  Reidhead Decl. ¶¶ 1, 7.  Based on these real-world numbers, Reidhead observed that Tito's Handmade Vodka:

(i) has experienced significant and sustained growth in the U.S. market[11]— ███████████ ████████████████████████████████████ (ii) grew first in the "on-premise" (bars and restaurant space); (iii) experienced a "fairly equal balance of growth in distribution [increasing presence in bars/restaurants] and growth in velocity [sales per point of distribution] … evidence of the strong grassroots demand among consumers, which in turn was recognized by bar/restaurant owners who then wanted to stock the brand;" (iv) ██████████████████ ██████████████████████ and (v) far outperformed other craft vodkas during the time period. *Id.* ¶ 7(a)-(e).   From these observations and based on his substantial experience, Reidhead "believes quite strongly that the growth in retailer distribution, consumer velocity, and the corresponding gains in market share that Tito's Handmade Vodka achieved during the 2011-2015 period, are due to uniquely strong word of mouth surrounding the brand," which fostered both initial and repeat purchases. *Id.* ¶ 9.

Reidhead's observations and conclusions in these regards were corroborated by the NERA survey. ██████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ███████████████ there is no basis for Singleton's assumption that the term handmade—as opposed to taste or other factors—caused many class members to purchase Tito's at any price.

---

[11] Reidhead further opined that his opinions based on nationwide data can be translated to a New York class, "given the size of the New York market (approximately 5% of Total U.S.), and the fact that the majority of vodka brands have fairly national footprints …."  Reidhead Report ¶ 8.

### 3.      There Is No Evidence of a Price-Premium Injury, Much Less a "Common" One

A plaintiff seeking compensatory damages under section 349 must show that the material deceptive act or practice caused "actual" injury, though not necessarily pecuniary harm. *Stutman v. Chem. Bank*, 95 N.Y.2d 24, 29 (N.Y. Ct. App. 2000). "'Deception and injury must be separately pled.'" *Kacocha*, 2016 WL 4367991, at *13 (quoting *Dimond v. Darden Rests., Inc.*, No. 13-CV-5244, at *9 (S.D.N.Y. July 9, 2014)). "[A] [section] 349 claim is infirm where the alleged injury consists only of having been deceived." *Id.* (citing *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 898 (N.Y. 1999)). Relief seeking monetary recoupment of the purchase price is not sufficient to state a claim under section 349. *Small*, 720 N.E.2d at 898. The important "'rationale' of this limitation 'is that deceived consumers may nevertheless receive-and retain the benefits of-something of value, even if it is not precisely what they believed they were buying.'" *Delgado v. Ocwen Loan Servicing, LLC*, No. 13-CV-4427 (NGG) (RML), 2014 WL 4773991, at *10 (E.D.N.Y. Sept. 24, 2014) (quoting *Servedio v. State Farm Ins. Co.*, 889 F. Supp. 2d 450, 452 (E.D.N.Y. 2012)). Thus, an actual injury claim under section 349 requires a plaintiff to "allege that, on account of a materially misleading practice, she purchased a product ***and*** did not receive the full value of her purchase." *Orlander*, 802 F.3d at 302 (emphasis added). Singleton has not demonstrated such an injury either individually or measurably on a classwide basis.

"'The first step in a damages study is the translation of the *legal theory of the harmful event* into an analysis of the economic impact *of that event*.'" *Comcast*, 133 S. Ct. at 1435 (quoting FEDERAL JUDICIAL CENTER, REFERENCE MANUAL ON SCIENTIFIC EVIDENCE 432 (3d ed. 2011) (emphasis in original). Singleton's class-certification record fails this initial step because it is based entirely on theory, assumptions, and speculation—not in any way grounded in economic analysis.

Singleton's theory of injury is that he and similarly situated consumers paid a retail "price premium" for Tito's Handmade Vodka based upon the belief that it was a higher-quality brand because of the way it was made.  But he has failed to show any basis for determining that there was in fact a price premium—much less one that can be determined for each class member.

Singleton's theory first requires him to identify an appropriate benchmark product.  Thus, his theory requires him to identify an appropriate benchmark product, with comparable quality ratings and comparable distribution, that sells at a lower retail price.  Singleton has been asked, but has yet to identify such a product.  Nor will he ever be able to do so.

His expert Coffey opined based on a single snapshot in time (2016) and prices not applicable in New York, that Tito's Handmade Vodka is higher priced that Smirnoff and Skyy because of its "handmade" label.  Coffey Decl. (Hopkins Decl., Ex. 12) ¶¶ 10-12; *see also* Coffey Depo. at 148:6-149:16.  In doing so, Coffey made no true comparison analysis.  Instead, he chose Smirnoff and Skyy because they were the only other corn-based,[12] non-foreign 80-proof brands in a top-10 list[13] he drew from a website he had never before used.  Coffey Depo. at 143:5-14; 152:18-22.  But there has been no showing that these are of comparable quality to Tito's.  Notably, ***Singleton himself*** considers these two brands to be lower tiered than Tito's.  Singleton Depo. at 98:24-99:7; *see id.* at 99:9-16 (acknowledging that Skyy is substantially less expensive than Tito's—"we're talking a [10-] or 15-dollar leeway …"); *see also* Nolletti Decl. ¶ 29 (Exhibit 12) ("Tito's Handmade Vodka readily competes with more expensive imports and "status symbol"

---

[12] Coffey admitted that the labels of Smirnoff and Skyy do not indicate they are made from corn, Coffey Depo. at 100:18-24; 152:18-22.  And

[13] Coffey failed to consider what brands were top sellers during any year during the class period except 2016— possibly because Tito's was not in the top ten list for sales on the particular website he used in prior years—or any brands that were not in the top ten that particular year according to the methodology that the website used.  *See, e.g.*, Liska Decl. ¶¶ 12.

vodkas, such as Ketel One or Stolichnaya, and it does not really compete with less expensive brands like Skyy and Smirnoff.").

As to the numbers, Coffey simply created averages from two website price listings (Benny's in Chicago and BevMo on the West Coast)[14] for these non-comparators on a single day and drew unfounded conclusions.  Coffey Depo. at 148:7-14, 18-22; 149:17-23.  He did not try to look for New York sources and agreed that the offerings and prices in local liquor retailers would likely vary.  Coffey Depo. at 145:15-22; 148:6-17.  He admitted he had no information for on-shelf, retail pricing for New York retailers during the class period.  *Id.* 150:8-151:1, and that he had not tried to compile a price picture for retail sales of vodka in New York.  *Id.* at 151:25-152:2.[15]

Singleton's other "price-premium" expert, Michael Meyerson ("Meyerson") opines that "it is possible to determine class-wide damages in this case, using market research data and defendant's own business records."  Meyerson Decl. ¶ 9 (attached to Hopkins Decl. as Ex. 1).  But Meyerson is a law professor, not an economist.  Meyerson Depo. at 10:21-24; 207:12-18.[16]  He is admittedly not an expert on the alcohol industry and relied exclusively on Coffey's declaration.  *Id.* at 23:12-24:4.  Although Meyerson opined that hedonic price analysis—an "econometric tool"—can be used "to separate and identify the price effect of each distinct characteristic" of a product, Meyerson Decl. ¶ 29, 36, he did not attempt to do so and admitted he was not aware of anyone who could calculate the portion of the retail price of Tito's Handmade Vodka in New York

---

[14] There are no chain stores, such as BevMo, in New York.  Nolletti Decl. ¶ 27.

[15] Neither Coffey nor Singleton's "consumer perception" expert, Jon Krosnick ("Krosnick") attempted to assess the impact of their claimed consumer perceptions of quality on consumers' purchase intent or willingness to pay more. *Id.* at 168:24-169:4; *see also* Krosnick Depo. at 109:14-21; 130:14-132:11.  And Krosnick's survey was not of consumers of Tito's Handmade Vodka, but of the public generally, and is of limited at best evidentiary value for multiple reasons, *see* Rappeport Decl. at 5-6 (Exhibit 14), as will be more fully developed in Fifth Generation's accompanying motion to strike his opinion testimony.

[16] Fifth Generation will be separately moving to strike the opinion testimony of each of Singleton's experts on various grounds, but in particular, Meyerson lacks the qualifications to provide opinions about retail vodka pricing in New York or anywhere.

attributable to plaintiff's handmade claim.  Meyerson Depo. at 239:24-240:8.  And neither Coffey nor Meyerson reviewed any aggregated sales data in connection with rendering his opinions.  *See, e.g.*, *id.* at 18:23-19:3.  And neither Meyerson nor Coffey provide ***any*** evidentiary support for the prices actually charged for any vodka in New York during the class period or any other time.

By contrast, Fulcrum Financial Inquiry ("Fulcrum") analyzed actual vodka sales in the New York Metro area (and nationally) during the class period based from a fee-based database developed and maintained by IRI, which collects point-of-sale data.  Liska Decl. ¶¶ 8-10, 14.



---

[17] Although the chart provided summarizes the 2014 data, the other years of the class period yield similar conclusions.  Liska Decl. ¶ 17.

Liska Decl. ¶ 17 (Exhibit 11).  Thus, Singleton cannot show a price premium.

Even if the Court were to indulge the theory of a price premium here, Singleton has failed to show that it could be calculated on a common basis.  As *Comcast* made clear, the economic model must "measure damages resulting from the particular [] injury on which [the] liability in this action is premised."  133 S. Ct. at 1433.  The omission of any economic—as opposed to theoretical, legal—model is not coincidence.  There would be no way to calculate a price premium without reference to the particular purchasing circumstances of each class member, considering that:  (i) alcohol manufacturers do not sell directly to retailers, much less consumers, and so do not control retail prices; (ii) in New York, there are no chain liquor stores, and grocery stores do not sell liquor, so "each retail liquor store is separate from the next and must set its own prices;" (iii) numerous individual strategies employed by these myriad liquor stores—such as discounts, promotions, etc.— impact retail pricing, which varies widely.  Nolletti Decl. ¶¶ 7-17.

## B.      The Intentional Misrepresentation Claim Fails to Satisfy Rule 23

To establish a claim for intentional misrepresentation, a plaintiff must show that "(1) the defendant made a material false statement or omission; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the representation or omission; and (4) the plaintiff suffered damage as a result of such reliance." *B & M Linen*, *Corp., v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 480 (S.D.N.Y. 2010) (citation omitted).  As explained above, the misrepresentation, causation, reasonable reliance (materiality), and damages elements of the fraud claim—to the extent it is actionable—cannot be certified.  *See* parts II.A.1-3.

## III.   Singleton Is Neither Typical of Nor Adequate to Represent the Class

A central "purpose of the typicality requirement is to ensure that . . . the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Mazzei v. Money Store*, 829 F.3d 260, 272 (2d Cir.

2016) (internal quotations omitted). Similarly, the adequacy of representation requirement "ensures that the named plaintiffs are appropriate representatives of the class whose claims they wish to litigate," *Dukes*, 564 U.S. at 349, by "effectively limit[ing] the class claims to those fairly encompassed by the named plaintiff's claims." *Falcon*, 457 U.S. at 156 (internal quotations and citation omitted). As explained above, Singleton's actual experience is not the one he pleads for the class. He could not have relied on the label, as he alleges the other class members did, and is subject to summary judgment on that unique basis—as more fully explained in Fifth Generation's contemporaneous motion—so neither typical of nor adequate to represent the other class members.

## IV.    A Class Action Would Not Be Superior to Other Resolutions

As noted above, Tito's Handmade Vodka is regulated by the TTB, the U.S. Government's expert on alcohol labeling. And the TTB has considered and rejected a previous challenge to the use of "handmade" on the label. *See* Factual Background, part A. It has also consistently approved the use of "crafted in an old-fashioned pot still" on the label for decades, even after having toured and thoroughly inspected Fifth Generation's distillery multiple times. *Id.* The TTB has a procedure for parties wishing to challenge an alcohol label. If an applicant wishes to appeal the denial or qualified approval of a COLA, the regulations require that the applicant first initiate an appeal to the TTB, in a multi-step process. 27 C.F.R. § 13.25-.27. The availability of this process demonstrates the superiority of that regulatory option to a class action seeking penalties.

## V.    Injunctive Relief Is Not Appropriate

Singleton asserts that the class can be alternatively certified under Rule 23(b)(2) because he seeks injunctive relief. But the injunctive relief he seeks—a label change—cannot be effected without approval by the TTB. Singleton's bid for this relief is an effective collateral challenge to the TTB's jurisdiction, providing yet another reason to deny certification.

**VI.     The Proposed Class Definition Is Improper**

The proposed class also fails on ascertainability grounds. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012).  As Fifth Generation does not sell directly to consumers, or even retailers, it will be difficult at best to determine who the class members are, as most are unlikely to have retained itemized receipts of their vodka purchases going back five years.  Singleton's proposal that class members identify themselves as class members through questionnaires has been rejected by a number of federal courts.  *See Byrd v. Aaron's, Inc.*, 784 F.3d 154, 165 (3d Cir. 2015); *see also Karhu v. Vital Pharms., Inc.*, 621 Fed. Appx. 945, 949 (11th Cir. 2015); *Hughes v. The Ester C Co.*, 317 F.R.D. 333, 349-50 (E.D.N.Y. 2016); *In re Avon Anti–Aging Skincare Creams & Prods. Mktg. & Sales Practices Litig.*, No. 13–CV–150(JPO), 2015 WL 5730022, at *5 (S.D.N.Y. Sept. 30, 2015); *Weiner v. Snapple Beverage Corp.*, No. 07 CIV. 8742(DLC), 2010 WL 3119452, at *12 (S.D.N.Y. Aug. 5, 2010).

Finally, in his Motion, Singleton suggests that the class period should be April 12, 2012, through present.  Motion at 1.  But Singleton filed suit in April 2015, and testified that he stopped purchasing Tito's Handmade Vodka before filing suit.  There is no basis for extending the class period indefinitely, and Singleton has provided no argument in this regard.

### PRAYER

For these reasons, Defendant Fifth Generation, Inc. requests that the Court deny Plaintiff's Motion for Class Certification and grant Defendant such other and further relief to which it is entitled.

Respectfully submitted,

*/s/ David L. Nocilly*
David L. Nocilly (SBN 510759)
BOND SCHOENECK & KING, PLLC
One Lincoln Center
Syracuse, New York  13202
Phone Number:  315-218-8000
Fax Number:  315-218-8100
dnocillly@bsk.com

Of Counsel:

Ricky L. Shackelford
GREENBERG TRAURIG LLP
California Bar No. 151262
(Pro Hac Vice)
1840 Century Park East, Suite 1900
Los Angeles, California  90067
Phone Number:  (310) 586-7700
Fax:  (310) 586-7800
shackelfordr@gtlaw.com

Marcy Hogan Greer
ALEXANDER DUBOSE JEFFERSON &
TOWNSEND LLP
Texas Bar No. 08417650
(Pro Hac Vice)
515 Congress Ave., Ste. 2350
Austin, Texas 78701-3562
Tel: (512) 482-9300
Fax: (512) 482-9303
mgreer@adjtlaw.com

*Attorneys for Defendant*
*Fifth Generation, Inc.*