**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
─────────────────────────────────────────────

**TREVOR SINGLETON,**
**individually and on behalf of all**
**others similarly situated,**

**Plaintiff,**

**v.**                                                                          **5:15-CV-474 (BKS/TWD)**

**FIFTH GENERATION, INC., d/b/a**
**TITO'S HANDMADE VODKA,**

**Defendant.**
─────────────────────────────────────────────

**APPEARANCES:**

For Plaintiff:

Eduard Korsinsky
Shannon L. Hopkins
Nancy A. Kulesa
Courtney Maccarone
Stephanie A. Bartone
Levi & Korsinsky LLP
733 Summer Street, Suite 304
Stamford, CT 06901

For Defendant:

David L. Nocilly
Bond, Schoeneck & King, PLLC
One Lincoln Center
Syracuse, NY 13202

Ricky L. Shackelford
Greenberg Traurig, LLP - Los Angeles Office
1840 Century Park East, Suite 1900
Los Angeles, CA 90067

Marcy Hogan Greer
Alexander Dubose Jefferson & Townsend LLP
515 Congress Avenue, Suite 2350
Austin, TX 78701

**Hon. Brenda K. Sannes, United States District Judge:**

## MEMORANDUM-DECISION AND ORDER

## I.   INTRODUCTION

Plaintiff Trevor Singleton brings this proposed class action under 28 U.S.C. § 1332(d)(2) against Defendant Fifth Generation, Inc., doing business as Tito's Handmade Vodka ("Tito's" or "Defendant"), seeking compensatory and injunctive relief for Defendant's allegedly false, deceptive, and misleading advertising and trade practices with respect to the promotion and sale of its Tito's Handmade Vodka.  (Dkt. No. 1).  Presently before the Court is Plaintiff's motion for class certification pursuant to Rule 23 of the Federal Rules of Civil Procedure.  (Dkt. No. 69).  Plaintiff asks the Court to certify as a class "all persons in New York who purchased Tito's Handmade Vodka ('Tito's') from April 12, 2012 through the present."  (Dkt. No. 69-1, p. 6).  Defendant opposes the motion, (Dkt. No. 87), and moves to strike Plaintiff's supporting expert declarations and reports.  (Dkt. Nos. 89-91).  Defendant has also submitted several declarations and reports in opposition to certification, which Plaintiff moves to strike, either in part or entirely.  (Dkt. Nos. 104-06, 112-13).  For the reasons that follow, Defendant's motions to strike are granted in part and denied in part, Plaintiff's motions to strike are denied, and Plaintiff's motion for class certification is denied.

## II.   BACKGROUND

Plaintiff's claims stem from the advertising and packaging of Tito's Handmade Vodka, which is manufactured and sold by Defendant with labels on the bottle stating that the vodka is "Handmade" and "Crafted in an Old Fashioned Pot Still."  (Dkt. No. 1, ¶¶ 1-2, 21).  Essentially, Plaintiff alleges that this representation as a whole, hereafter referred to simply as the "handmade

representation," is deceptive, false and misleading because Defendant's vodka is actually manufactured and/or produced in "massive buildings containing ten floor-to-ceiling stills and bottling 500 cases an hour" using automated machinery and highly-mechanized processes which involve little to no human supervision, assistance, or involvement. (*Id.*, ¶¶ 3, 6, 24, 44) (quoting *Forbes Magazine*, "The Troubling Success of Tito's Handmade Vodka," July 15, 2013).

Plaintiff further alleges that, in making the "handmade representation", Defendant: 1) "concealed the highly automated nature of the vodka's manufacturing and bottling process that occurs in massive buildings containing ten floor-to-ceiling stills"; and 2) "seeks to capitalize on consumers' preferences for a higher quality vodka." (*Id.*, ¶¶ 26-27). Plaintiff alleges that "Defendant has marketed its vodka as 'Handmade,' despite the fact it uses mechanized processes, in order to induce the purchase of its product for a higher price and at a greater sales volume," which has enabled Defendant "to sell Tito's Handmade Vodka at a higher price in comparison to competitors' products" due "to the better quality associated with handmade products." (*Id.*, ¶ 28). Plaintiff alleges that he and the proposed class members believed that, based on Defendant's representation, "Tito's Handmade Vodka was in fact 'Handmade' and 'miscrodistilled [sic] in an old-fashioned pot,' thus making it a higher quality and more costly than its non-handmade counterparts," and moreover, "had they been made aware that Tito's Vodka was not 'Handmade' or crafted in small batches, they would not have purchased the product, or would have paid less for it." (*Id.*, ¶¶ 6-7, 30).

## III.   PROCEDURAL HISTORY

On January 12, 2016, the Court denied Defendant's motion to dismiss Plaintiff's claims for 1) violation of New York General Business Law § 349; and 2) intentional misrepresentation

under New York law, but dismissed Plaintiff's state law claims for breach of express warranties and negligent misrepresentation.  (Dkt. No. 32).  The case was bifurcated for discovery purposes, with class certification discovery first, followed by merits discovery.[1]  (Dkt. Nos. 35, 58, 97).  Plaintiff filed for class certification on February 3, 2017 (Dkt. No. 69), and Defendant moved for summary judgment on May 20, 2017 (Dkt. Nos. 80, 88).  Plaintiff opposes Defendant's motion for summary judgment on the basis that it is premature since merits discovery is still underway. (Dkt. No. 108).  Because discovery was bifurcated and is ongoing as to the merits, the Court will not address Defendant's motion for summary judgment at this juncture; this decision is limited to Plaintiff's motion for class certification.  *See Kurtz v. Kimberly-Clark Corp.*, No. 14 Civ. 1142, 2017 WL 1155398, at *18, 2017 U.S. Dist. LEXIS 44576, at *52-53 (E.D.N.Y. Mar. 27, 2017) (deciding the plaintiffs' motion for class certification but holding the defendant's summary judgment motion in abeyance where "[c]lass discovery was prioritized over merits discovery" and "[t]he parties have conducted sufficient discovery for the court to rule on class certification, but not enough to decide summary judgment"); *Seekamp v. It's Huge, Inc.*, No. 09 Civ. 18, 2012 WL 860364, at *13, 2012 U.S. Dist. LEXIS 33295, at *44 (N.D.N.Y. Mar. 13, 2012) (denying cross-motion for summary judgment as premature in class action); *Cuzco v. Orion Builders, Inc.*, 262 F.R.D. 325, 335 (S.D.N.Y. 2009) ("A court's decision on the merits . . . should ordinarily not occur before or simultaneous with a decision on class certification.") (citing *Philip Morris Inc. v. Nat'l Asbestos Workers Medical Fund*, 214 F.3d 132, 135 (2d Cir. 2000)); *Mendez v. The Radec Corp.*, 260 F.R.D. 38, 44-45 (W.D.N.Y. 2009) (citing cases).

---

[1] Merits discovery ends six months after the date of the Court's decision on class certification.  (Dkt. No. 97).

IV.   **DISCUSSION**

  **A.  Motions Regarding Expert Testimony**

Before addressing the merits of the certification motion, the Court must consider the

parties' challenges to their opponent's experts.  Each motion argues that the testimony at issue

falls short of the standards set forth in Rule 702 of the Federal Rules of Evidence and *Daubert v.*

*Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).  When expert testimony is submitted

at the class certification stage, neither the United States Supreme Court nor the Second Circuit

has "definitively ruled on the extent to which a district court must undertake a *Daubert* analysis"

of the proffered testimony.  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 129 (2d Cir.

2013).  "Most courts that have addressed the issue have concluded that the *Daubert* test does

apply in this context."  *Chen-Oster v. Goldman, Sachs & Co.*, 114 F. Supp. 3d 110, 114

(S.D.N.Y. 2015) (citing cases).  "Several rationales support this view," including that: 1)

"*Daubert* is an amplification of Rule 702, and the Federal Rules of Evidence apply generally to

'proceedings' in the courts of the United States"; 2) "the Supreme Court has directed district

courts to conduct a 'rigorous analysis' in class certification proceedings to determine whether the

requirements of Rule 23 of the Federal Rules of Civil Procedure are met"; and 3) "the Supreme

Court itself has expressed skepticism at the suggestion that *Daubert* would not apply to expert

testimony at the class certification stage."  *Id.* (citing, *inter alia*, *Gen. Tel. Co. of S.W. v. Falcon*,

457 U.S. 147, 161 (1982); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 354 (2011)).  For these

reasons, the Court finds that it is appropriate to undertake a *Daubert* analysis.[2]  "However, the

---

[2] *See also In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015) (joining the Seventh, Eighth, and
Ninth Circuits in holding "that a plaintiff cannot rely on challenged expert testimony, when critical to class

scope of the *Daubert* analysis is cabined by its purpose at this stage: the inquiry is limited to whether or not the expert reports are admissible to establish the requirements of Rule 23." *Id.* (internal quotation and citation omitted).

Under Rule 702 of the Federal Rules of Evidence, the Court is charged with a "gatekeeping" obligation with respect to expert testimony: the trial judge must ensure "that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert*, 509 U.S. at 597.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.  "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."  *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004).  "Generally speaking, expert qualifications are liberally construed."  *Rondout Valley Cent. Sch. Dist. v. Coneco Corp.*, 321 F. Supp. 2d 469, 474 (N.D.N.Y. 2004) (citing *United States v. Brown*, 776 F.2d 397, 400 (2d Cir. 1985); *Canino v. HRP, Inc.*, 105 F. Supp. 2d 21, 27 (N.D.N.Y. 2000)).

"Under *Daubert*, factors relevant to determining reliability include the theory's testability, the extent to which it has been subjected to peer review and publication, the extent to

---

certification, to demonstrate conformity with Rule 23 unless the plaintiff also demonstrates, and the trial court finds, that the expert testimony satisfies the standard set out in *Daubert*").

which a technique is subject to standards controlling the technique's operation, the known or

potential rate of error, and the degree of acceptance with the relevant scientific community."

*Restivo v. Hessemann*, 846 F.3d 547, 575-76 (2d Cir. 2017) (internal quotations and citation

omitted).  The reliability inquiry is "a flexible one," *Daubert*, 509 U.S. at 594, and the factors to

be considered "depend[ ] upon the particular circumstances of the particular case at issue."

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 150 (1999).  When applying the gatekeeping

obligation to non-scientific testimony, a district court may choose to utilize some or all of the

above *Daubert* factors, or it may look to other indicia of reliability.  *Id.*

　　　"In undertaking this flexible inquiry, the district court must focus on the principles and

methodology employed by the expert, without regard to the conclusions the expert has reached

or the district court's belief as to the correctness of those conclusions."  *Amorgianos v. Natl. R.R.*

*Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002).  "Thus, when an expert opinion is based on

data, a methodology, or studies that are simply inadequate to support the conclusions reached,

*Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony."  *Id.*  In other

words, "[a] court may conclude that there is simply too great an analytical gap between the data

and the opinion proffered."  *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).  "Frequently,

though, 'gaps or inconsistencies in the reasoning leading to [the expert's] opinion . . . go to the

weight of the evidence, not to its admissibility.'"  *Restivo*, 846 F.3d at 577 (quoting *Campbell ex*

*rel. Campbell v. Metro. Prop. & Cas. Ins. Co.*, 239 F.3d 179, 186 (2d Cir. 2001)).

　　　Ultimately, a district court has "the same broad latitude when it decides *how* to determine

reliability as it enjoys in respect to its ultimate reliability determination."  *Id.* at 142.  Moreover,

"[v]igorous cross-examination, presentation of contrary evidence and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

With this framework in mind, the Court will address the proffered expert testimony.

### 1)  Donald Coffey

Plaintiff has submitted a declaration from Coffey, who is the founder and president of a firm that consults on technology and commercial issues with the food and beverage industry and a former executive at "one of the largest suppliers of Neutral Grain Spirits ('NGS')—also known as Grain Neutral Spirit ('GNS')—to the beverage industry in the United States." (Dkt. No. 69-2, p. 233). According to Coffey, he "reviewed online research to determine the top selling vodka brands in 2015," which were, in descending order: "Smirnoff, Absolut, Svedka, Skyy, Grey Goose, New Amsterdam, Ketel One, Tito's Handmade, Ciroc." (*Id.*, p. 235). From this list, Coffey identified two vodkas to compare with Tito's: Smirnoff and Skyy. (*Id.*, pp. 235-36). Coffey explained that of the top selling vodkas, only these three are corn-based, and that since vodka is a neutral spirit distilled and treated "to be without distinctive character, aroma, taste, or color," "one of the few distinguishing features between vodkas is the substances from which they are distilled (i.e. wheat, rye, corn, potatoes, etc.)." (*Id.*). Coffey also stated that he "eliminated imported vodkas from France or other European countries as these vodkas are inherently more expensive." (*Id.*, p. 236). Coffey identified the average price of the selected vodkas as follows: $12.99 for Smirnoff, $14.99 for Skyy, and $21.99 for Tito's. (*Id.*). Looking at these prices, Coffey opined that "based on my over 30 years of experience in this industry, there are so few distinguishing factors between corn based vodkas, that it can reasonably be said that the main

reason for the price premium consumers paid for Tito's Handmade Vodka was based on the concept of Tito's being 'Handmade.'"  (*Id.*).

Defendant objects to Coffey's testimony on the basis that he "is not qualified to render the opinions he has proffered as an expert, and his opinions are not based on reliable or adequate information."  (Dkt. No. 89-1, pp. 3-4).

### a.  Qualification

Defendant argues that Coffey is "not qualified to testify concerning any retail pricing model or appropriate substitute products to use in any price premium model in this case" because he is not an economist or an expert in liquor distribution or retailing.  (Dkt. No. 89-1, pp. 13-15).  In response, Plaintiff asserts that "Coffey's opinions are offered as an *industry* expert and he is more than qualified to opine on the composition, ingredients and production of vodka and what properties make one vodka more comparable to another."  (Dkt. No. 109, p. 2).  Coffey's declaration shows that he has a B.S., M.S., and Ph.D. in Food Science, and moreover, he has significant experience in the alcoholic beverage industry.  (Dkt. No. 69-2, p. 233).  Based on this education and experience, the Court finds that Coffey is qualified to opine on comparable vodkas and whether consumers paid a premium for Tito's.  Defendant's arguments go to the weight of Coffey's testimony, not its admissibility.  *See McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) ("Fuller's quibble with Woolley's academic training in fume dispersal and air quality studies, and his other alleged shortcomings (lack of knowledge regarding the chemical constituents of the fumes or the glue vapor's concentration level), were properly explored on cross-examination and went to his testimony's weight and credibility—not its admissibility."); *Hilaire v. DeWalt Indus. Tool Co.*, 54 F. Supp. 3d 223, 236 (E.D.N.Y. 2014) ("Thus, a witness'

lack of particular knowledge, education, or experience may go to the weight, not the admissibility, of the testimony.").

### b.  Reliability

Defendant further argues that Coffey's opinion should be excluded because his "methods are not recognized." (Dkt. No. 89-1, p. 15).  Defendant offers a battery of criticisms of Coffey's methodology, including that: 1) he did not employ proper criteria for identifying vodkas to compare with Tito's; and 2) he did not rely on New York pricing data.  (*Id.*, pp. 15-17).  At his deposition, Coffey testified that he excluded higher-priced premium vodkas based on his "personal gut call." (Dkt. No. 92-1, p. 569).  Coffey also testified that he came up with prices for Tito's, Skyy, and Smirnoff by doing an online search[3] on one day in 2016 and averaging prices from two retailers located outside of New York, Benny's and BevMo.  (*Id.*).  As to the first criticism, Plaintiff points out that Coffey excluded higher-priced vodkas based on his industry experience, and moreover, he also excluded vodkas not containing corn.  (Dkt. No. 109, p. 7).  As to the second criticism, Plaintiff argues that the pricing data used by Coffey may also be representative of the prices in New York.  (*Id.*, p. 8).

Coffey's non-scientific testimony calls for a flexible *Daubert* inquiry.  While his method is somewhat shaky, Coffey has substantial experience in the industry and he articulated the basic reasoning for his opinions.  Ultimately, Defendant's criticisms go to the weight of his testimony, not its admissibility.  Thus, the Court finds that Coffey's testimony is sufficiently reliable to warrant its admission for the limited purpose of deciding whether Plaintiff has met the

---

[3] Coffey searched the online database at https://www.statista.com.  (Dkt. No. 69-2, p. 235).

requirements of Rule 23.  The Court will discuss this issue separately below, specifically whether Coffey's comparator model may be used to measure damages tied to the class's theory of injury. *See McCulloch*, 61 F.3d at 1044 ("faults in [expert's] use of differential etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony"); *Dial Corp. v. News Corp.*, 165 F. Supp. 3d 25, 42 (S.D.N.Y. 2016) ("the parties' many disagreements over [the expert's] methodologies go to the weight, not admissibility").  Accordingly, Defendant's motion to strike Coffey's testimony is denied.

### 2)  Jon A. Krosnick, Ph.D.

Plaintiff has also submitted two reports by Krosnick, "the Frederic O. Glover Professor of Humanities and Social Sciences and a Professor of Communication, Political Science, and (by courtesy) Psychology at Stanford University in Stanford, California, a Research Psychologist at the U.S. Census Bureau, and a Research Advisor of the Gallup Organization."  (Dkt. No. 69-2, p. 255).[4]  Krosnick was engaged to "offer opinions regarding whether allegedly misleading information disseminated by Tito's about their vodka is material to a reasonable consumer." (*Id.*).  To answer this question, Krosnick "oversaw the design and conduct of an experiment embedded in a survey conducted with a nationally representative sample of American adults." (*Id.*, p. 257).  Krosnick described his process as follows:

> First, I designed a questionnaire that presented information about Tito's Handmade Vodka to people.  During the survey, respondents saw images of, and text from, labels on a bottle of Tito's Handmade Vodka.  For half of the respondents (chosen randomly), the questionnaire followed the display of the labels with additional information about the manufacturing process of Tito's Handmade Vodka that appeared in a 2013 Forbes magazine article.  The

---

[4] Defendant acknowledges that Krosnick is "an experienced witness," and does not challenge his qualifications. (Dkt. No. 145, p. 2).

questionnaire then asked respondents to rate Tito's handmade Vodka along three quality dimensions.  The questionnaire was subjected to cognitive pretesting and was then administered to a large, nationally representative sample of American adults ages 21 years old or older.

(*Id.*, p. 271).  The additional information from Forbes referenced by Krosnick is the following statement: "According to an investigation by Forbes Magazine, Tito's Handmade Vodka is made in 'massive buildings containing ten floor-to-ceiling stills and bottling 500 cases an hour.'"  (*Id.*, p. 389).  In his first report, Krosnick states that the survey results "indicate that people who read only the label on Tito's Handmade Vodka bottles rated the product as having significantly higher quality than did people who also read the corrective statement from Forbes," and thus, "the allegedly misleading information on the label is material to a reasonable consumer."  (*Id.*, p. 281).  Krosnick concluded that the survey data "indicate that people perceived Tito's Handmade Vodka to be of higher quality when exposed only to alleged misleading statements on Tito's Handmade Vodka labels about the manufacturing process of Tito's Handmade Vodka."  (*Id.*, p. 282).

Defendant argues that Krosnick's first report is irrelevant and inadmissible for two reasons: 1) his survey "is based upon an improper definition of materiality"; and 2) his survey "was not directed to the correct respondents."  (Dkt. No. 90-1, pp. 9-10).  Essentially, Defendant argues that Krosnick's survey methodology is flawed because he did not test willingness to buy among actual purchasers of Tito's in New York.  In response, Plaintiff asserts that Krosnick's survey properly tested materiality by measuring the impact of the corrective statement on consumers' perception of the quality of Tito's vodka, and moreover, the proper target population was the drinking-age general public.  (Dkt. No. 110, pp. 6-11).  After careful review of Krosnick's first report, the Court finds that the purported flaws identified by Defendant in

Krosnick's survey methodology are not so glaring as to render the report unreliable.  Rather,

Defendant's criticisms about "gaps or inconsistencies in the reasoning" go to the weight of

Krosnick's opinion.  *See Restivo*, 846 F.3d at 577.

In Krosnick's second report, he states that "[a]ssuming that materiality of Tito's allegedly

false claims can be scientifically demonstrated," he "can employ a series of different methods" to

provide information about the price premium – "how much less consumers would have spent on

Tito's vodka purchased during the class period in New York if the consumers had known the

truth about the manufacturing process."  (Dkt. No. 116, p. 57).  Specifically, Krosnick describes

two different damages models.  (*Id.*).  First, Krosnick explains a "conjoint analysis" as follows:

> I can implement an experiment in a survey using these principles by describing to
> respondents a bottle of Vodka with specific features and offered at a specific price
> and giving the respondents the opportunity to indicate that they choose to buy the
> bottle or not.  All respondents will be told about a single set of features of the
> vodka, including the claims made on Tito's label about the manufacturing process
> used to produce their vodka.   Each respondent will be randomly assigned to be
> told as well the corrective statement employed in the survey I have done thus far.
> Furthermore, each respondent will be randomly assigned to be offered the bottle
> at one of various different prices surrounding the conventional retail prices of
> Tito's vodka.

> With the resulting data, it will be possible to compute the average willingness to
> pay for the vodka when told Tito's claims about the manufacturing process, and
> the average willingness to pay for the vodka when told how the vodka is in fact
> manufactured.   The difference between these two averages will constitute the
> price premium and can be described as a percentage: the percent less that
> consumers pay for the vodka as the result of being told about the actual
> manufacturing process employed by Tito's.  It is possible that consumers will pay
> no less for the vodka when told this information, and it is possible that consumers
> will pay less.  It is even possible that consumers will pay more.  The study I
> propose is designed to reveal this.

> With this "percent discount", I can then calculate the amount of overpayment by
> consumers for Tito's vodka in New York during the class period using the
> number of units of Tito's sold then (which presumabl[y] the manufacturer knows)
> and the retail prices paid by consumers for those units during that time.

One way to obtain these prices would be to subpoena a random sample of all alcohol retailers in the state of New York to review their sales records and report the number of units of Tito's sold during the class period and the retail price paid for each unit.

(*Id.*, pp. 60-61).  Second, Krosnick describes a "hedonic regression" analysis:

Multivariate regression techniques can be applied to data on purchases of all vodkas in New York during the class period.  The regressions would predict the number of bottles purchased and the prices paid for the vodkas.  The predictors in the regressions would be the attributes of the bottles: the amount of vodka provided, the ingredients used, flavoring, and other attributes, such as whether the vodka was hand-made in small batches.  The resulting coefficient estimates would gauge the impact of making that latter claim on the price paid, holding constant all other features of the vodkas.  If the coefficient is statistically significant and positive, its magnitude indicates how much more consumers paid for Tito's vodka during the class period due to the allegedly false claim about its manufacturing process.

(*Id.*, p. 61).  Krosnick adds that "[t]he data needed to conduct these analyses can also be obtained by subpoenaing a random sample of liquor retailers in New York to report the number of bottles of all brands of vodka sold in New York during the class period and the prices paid by consumers."  (*Id.*, p. 62).

Defendant does not challenge the damages models put forward in Krosnick's second report but simply argues "the need to conduct the new [materiality] survey he describes proves that his prior survey failed to ask the right questions to anyone."  (Dkt. No. 145, p. 11).[5]  After careful review of Krosnick's second report, the Court finds that it is also sufficiently reliable to

---

[5] In response to Krosnick's second report, Defendant initially submitted a letter objecting to, among other things, the "belated production of the new damage theories from this expert."  (Dkt. No. 117, p. 2).  Defendant complained that it had not had "an opportunity to challenge or brief for the Court the issues raised by this new report," and requested that portions of the report be either withdrawn, stricken, or that Defendant be allowed to file a sur-reply in response.  (*Id.*, pp. 1-3).  By Order dated July 27, 2017, the Court permitted Defendant to address Krosnick's second report in its response to Plaintiff's motion to strike the expert report of Sarah Butler (since she was offered to rebut Krosnick) and extended the deadline to do so.  (Dkt. No. 127).  However, Defendant did not actually take advantage of that opportunity to address its concerns about the "new damage theories" offered by Krosnick.  (*See* Dkt. No. 137).

warrant its admission for the limited purpose of deciding whether Plaintiff has met the requirements of Rule 23, which the Court will discuss separately below.  Accordingly, Defendant's motion to strike Krosnick's testimony is denied.  *See also In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 946 (C.D. Cal. 2015) ("Admissibility turns on whether Weir's methodology is sufficiently reliable; whether it satisfies *Comcast* and shows that a class should be certified is another question altogether—one which the court will address *infra* in conducting a Rule 23(b)(3) predominance analysis."), *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121 (9th Cir. 2017), and *aff'd sub nom. Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654 (9th Cir. 2017).

### 3)  Michael Meyerson

Plaintiff has also submitted a declaration from Meyerson, "the DLA Piper Professor of Law at the University of Baltimore School of Law."  (Dkt. No. 69-2, p. 6).  Meyerson was engaged by Plaintiff to assess "whether it is possible to determine damages in this case on a class-wide basis, using common evidence and, if so, to assess the appropriateness of various restitutionary remedies for consumers who purchased Tito's Handmade Vodka ('Tito's'), which had been falsely labeled 'Handmade.'"  (*Id.*).  Meyerson opined that "[t]he harm caused by Fifth Generation's deception can be calculated based on the premium consumers paid based on the mistaken belief the vodka was handmade," and that "the price premium would need to be calculated as the difference between what consumers paid for Tito's Handmade Vodka under the false impression that it was 'handmade' and what they received, vodka mass produced in modern giant-sized stills with little to no human interaction."  (*Id.*, pp. 12-13).

15

Meyerson explained that using Coffey's pricing data, the premium could be calculated by "simply comparing the price charged by Tito's Handmade Vodka with that charged by Smirnoff and Skyy." (*Id.*, p. 14). This analysis would assume that Coffey identified appropriate comparators, and that the "handmade representation" was the only distinguishing characteristic for consumers in choosing between them. (*See id.*). Meyerson further stated that if Coffey's prices "are representative of the prices paid by consumers, the price premium for the harm caused by Fifth Generation's deceptive advertising of Tito Handmade Vodka would be between 7 and 9 dollars a bottle." (*Id.*).

Alternatively, Meyerson explained that "[w]hen products have multiple characteristics that affect their relative pricing, economists have developed an econometric tool, hedonic price analysis, to separate and identify the price effect of each distinct characteristic." (*Id.*, p. 15). Meyerson stated that "[f]or an hedonic price analysis to be done, it is necessary to identify the different characteristics of a product that affect a consumer's purchasing decisions." (*Id.*). Meyerson pointed to several studies to support the proposition that "[e]conomists have been able to identify relevant characteristics, and thereby conduct a successful hedonic price analysis, for numerous consumer goods, including alcoholic beverages." (*Id.*, pp. 16-17). Meyerson opined that "an hedonic price analysis can be done for vodka purchases in general and to disaggregate and identify the price premium related to the deceptive description of 'Tito's Handmade Vodka' and thereby calculate class-wide damages." (*Id.*, p. 18). Meyerson further stated that:

> In my opinion, identifying the relevant characteristics for vodka would be readily achievable. A review of labels and advertising for these vodkas, in combination with a consumer survey, would reveal which product characteristics, including the deceptive "handmade" characteristic, affect consumer purchasing decisions. Among the characteristics that may be relevant would include packaging, brand name, where the product is made, ingredients, size, and perceived taste. Once the

16

> relevant characteristics were identified, a hedonic regression analysis could identify the value associated with each characteristic.  From that, the added value associated with the deceptive characteristic of the vodka being labeled as "handmade," would be identified.
>
> By multiplying the added value per unit by the number of units sold, the Price Premium damages can be calculated classwide.

(*Id.*, pp. 19-20).

Defendant seeks to strike Meyerson's declaration on the grounds that he is not qualified as an expert and he has not "performed any research or analysis to provide an adequate foundation for his opinions."  (Dkt. No. 91-1, p. 2).  In response, Plaintiff states that Meyerson is merely offered "as a teaching expert on the appropriate use of damage models and various restitutionary remedies."  (Dkt. No. 111, p. 5).

First, as Defendant points out, there is no indication that Meyerson is qualified to opine on the efficacy of damages models in this case.  Meyerson is professor of contracts law and does not appear to have any relevant experience in economics, damages, or statistical analysis.  (*See* Dkt. No. 69-2, pp. 21-26).  Second, it cannot be said that his opinions derive from any specialized knowledge.  Meyerson's declaration shows that much of the basis for his opinions on damages models is a review of consumer class action cases, many of which are cited by the parties and discussed in this decision.  (*Id.*, pp. 12-15).  At his deposition, Meyerson acknowledged that he does not have any expertise in actually performing hedonic regression or calculating damages.  (Dkt. No. 92-1, pp. 667, 686).  As Defendant suggests, Meyerson merely "offers up some ideas about what opinions might be reached by another, qualified, expert who actually does the research and analytical work required."  (Dkt. No. 91-1, p. 3).  Accordingly,

after carefully reviewing Meyerson's declaration and testimony, the Court finds that his opinions must be excluded.  Therefore, Defendant's motion to strike Meyerson's testimony is granted.

### 4)  Defendant's Experts

In opposition to Plaintiff's motion for class certification, Defendant has submitted declarations and reports from a number of experts that challenge the methods and conclusions of Plaintiff's experts.  They are briefly summarized as follows.

### a.  Nicole Liska

Liska is a principal at Fulcrum Financial Inquiry LLP, a business which performs damages analyses in litigation, business appraisals and forensic accountings.  (Dkt. No. 92-1, p. 599).  Defendant engaged Liska to respond to Coffey's opinion in this case regarding the alleged price premium for Tito's vodka.  (*Id.*, p. 600).  Liska offers several critiques of Coffey's methodology, including that he only sampled one year and he did not identify appropriate comparators for Tito's.  (*Id.*, pp. 602-03).  According to Liska, Coffey should not have used Skyy and Smirnoff to compare with Tito's and he should not have excluded vodkas with a price over $25 per unit.  (*Id.*, pp. 604-05).  Further, Liska conducted an analysis of vodka sales data from 2012 to present, including annual sales data for the New York City metropolitan area and weekly national sales data.  (*Id.*, p. 601).  Looking at the New York pricing for the 21-22 vodkas which comprised approximately 80% of the market in 2012-2016, Liska found that Tito's was a "mid-range priced label" and further, that it was priced below the weighted average price of all regular vodka labels in those years.  (*Id.*, pp. 604-14).[6]

---

[6] The proprietary data and charts underlying these findings are sealed.  (*See* Dkt. Nos. 95, 119).

### b.  Ray Nolletti

Nolletti is the part owner of a liquor store in Mamaroneck, NY, who previously worked

for 48 years in wine and liquor distribution.  (Dkt. No. 92-1, pp. 623-24).  Nolletti opined that,

based on his experience, various circumstances in the marketplace "lead to different retail stores

independently setting different prices for the same products, and the manufactures have no

control over that," and that "there is no way to truly know the market price for a particular wine

or spirit without surveying all the individual retailers or obtaining actual sales data across the

market from some other source."  (*Id.*, pp. 627-28).  Nolletti further stated that:

> Determining each brand's competitive set is not necessarily tied to its price.
> Rather, retailers perceive these different competitive sets based on their
> experience in the market in which they operate.  Tito's Handmade Vodka is a
> good illustration, because it typically sells for less than the others in this "high
> end" competitive set, but many customers of mine that used to be loyal to other
> "high end" vodkas have switched to Tito's Handmade Vodka.
> . . . . .
> I know from experience that Tito's Handmade Vodka does not really "compete"
> with Skyy or Smirnoff, or any other vodkas for that matter that I may put on
> special because when those brands are being promoted on special, sales of Tito's
> Handmade Vodka remain consistently excellent.

(*Id.*, pp. 629-30).  Nolletti criticizes Coffey's choice of comparators for Tito's, stating that "in

the real world, the competition for Tito's Handmade Vodka is not determined by country of

origin or whether the vodka is corn-based.  Rather, Tito's Handmade Vodka readily competes

with more expensive imports and 'status symbol' vodkas, such as Ketel One or Stolichnaya, and

it does not really compete with less expensive brands like Skyy and Smirnoff."  (*Id.*, p. 631).

### c.  Peter Reidhead

Reidhead is the former vice-president of Strategy & Insights at GuestMetrics, a company

that "gathered transaction level data from the point-of-sale (POS) systems from over 10,000 bars

and restaurants in the United States."  (Dkt. No. 92-1, p. 587).  Among other things, Reidhead states that, based on his experience and the aggregated data, "I believe quite strongly that the growth in retailer distribution, consumer velocity, and the corresponding gains in market share that Tito's Handmade Vodka achieved during the 2011-2015 period, are due to the uniquely strong word of mouth surrounding the brand."  (*Id.*, p. 594).  Reidhead further states that "[t]his word of mouth led consumers to try Tito's Handmade Vodka, and then, due to the high degree of satisfaction they had with the brand, they then kept buying it again on subsequent occasions," and that "[t]hese repeat purchases were not because of the label, but because the consumers liked the product."  (*Id.*).

### d.  Sarah Butler

Butler is the Managing Director at NERA Economic Consulting, a firm which provides expert statistical, survey, economic, and financial research analysis.  (Dkt. No. 92-1, p. 160). Defendant engaged Butler "to evaluate what factors influence consumers' decisions to purchase Tito's Handmade Vodka."  (*Id.*, pp. 161-62).  Among other things, she tested "why consumers first purchased Tito's Handmade Vodka, why consumers continue to purchase the product, and whether an understanding that Tito's is produced in large quantities in an industrial complex would impact consumers' purchase decisions."  (*Id.*).  To answer these questions, she conducted an internet survey of 353 consumers, targeting men and women 21 years of age or older who have purchased a bottle of Tito's in the past six months.  (*Id.*, p. 162).  Butler's findings essentially rebutted Krosnick on the issue of materiality.  According to Butler, the results of the

survey showed that most respondents bought Tito's vodka based on recommendations or past experience, not because of the "handmade representation."  (*Id.*, pp. 162-64, 188).[7]

### e.   Michael Rappeport

Defendant engaged Rappeport to "provide a commentary concerning the design, implementation, analysis and conclusions of the Krosnick Survey."  (Dkt. No. 92-1, p. 647). Rappeport's major critique of Krosnick's survey is that the target population should have been Tito's purchasers and not the general public.  (*Id.*, pp. 651-53).  Rappeport also points out several alleged "process flaws": the lack of controls, the internet look-up problem, leading questions, and sensitivity tests of the rating questions.  (*Id.*, pp. 653-54).  Rappeport opines that these flaws "severely undermine" Krosnick's conclusions.  (*Id.*, p. 655).

### f.   Plaintiff's Objections

Plaintiff objects to the opinions of Defendant's experts in myriad ways, but the vast majority of complaints are directed at their methodologies.  For example, Plaintiff argues that Liska used unreliable pricing data and flawed methods to identify comparators for her price premium analysis.  (Dkt. No. 105).  Similarly, Plaintiff argues that Reidhead used "unreliable data and methodologies," (Dkt. No. 104), that Nolletti's opinion is "based on unreliable, speculative, and non-representative data," (Dkt. No. 106), and that Butler's survey used an unreliable panel and her questions were flawed (Dkt. No. 112).  These critiques bear upon the weight given to the evidence, not its admissibility.  *See Restivo*, 846 F.3d at 577; *see also In re Scotts EZ Seed Litig.*, No. 12 Civ. 4727, 2017 WL 3396433, at *8, 2017 U.S. Dist. LEXIS

---

[7] The proprietary data and charts underlying these findings are sealed.  (*See* Dkt. Nos. 95, 119).

125621, at *21-22 (S.D.N.Y. Aug. 8, 2017) (finding that critiques as to expert's methodology, including that he "failed to survey the proper universe," "failed to include a control group," and failed to measure a "price premium," went to the weight of his testimony, not admissibility); *Dzielak v. Whirlpool Corp.*, No. 12 Civ. 89, 2017 WL 1034197, at *19, 2017 U.S. Dist. LEXIS 39232, at *52 (D.N.J. Mar. 17, 2017) ("Defendants' challenges to the 'willingness to pay' and survey population components go to weight, not admissibility."). Moreover, to the extent that Defendant's experts opine directly on the actual merits of the case, the Court need not decide their admissibility at this juncture.

In sum, the Court finds that Defendant's experts' opinions are sufficiently reliable to warrant admission for the limited purpose of deciding whether *or not* Plaintiff has satisfied the requirements of Rule 23.[8] Accordingly, Plaintiff's motions to strike the testimony of Defendant's experts are denied. *See also Dial Corp.*, 165 F. Supp. 3d at 42 ("Ultimately, the parties' many disagreements over [plaintiff's expert's] methodologies go to the weight, not admissibility of [his] testimony. . . .Where, as here, [plaintiff's expert's] methodologies are not clearly unsound or unreasonable, this Court declines to exclude his testimony on a *Daubert* motion."); *In re Vitamin C Antitrust Litig.*, No. 06 MD 1738, 2012 WL 6675117, at *8, 2012 U.S. Dist. LEXIS 181158, at *30-31 (E.D.N.Y. 2012) ("[P]laintiffs' motion asks the Court to take sides in a dispute between experts about the intricacies of economic modeling. That is not

---

[8] The Court also finds that Plaintiff's arguments as the qualifications of Defendant's experts go to the weight of their opinions, not admissibility. Plaintiff contends that Nolletti is not qualified to opine on appropriate comparators for Tito's vodka (Dkt. No. 106), but like Plaintiff's expert Coffey, Nolletti has extensive experience in the alcoholic beverage industry. Similarly, Plaintiff argues that Reidhead lacks necessary qualifications, (Dkt. No. 104), but he too has extensive experience in the industry. (*See* Dkt. No. 92-1, pp. 587-89). Although Plaintiff argues that Liska is not qualified to opine on whether consumers paid a price premium for Tito's vodka, (Dkt. No. 105), as Defendant points out, Liska has a Master's Degree in Economics, fifteen years of relevant experience, and has "performed numerous analyses in litigation cases assessing the market." (Dkt. No. 146, pp. 13-15).

the proper function of a *Daubert* motion.  This is not a case in which an expert is unable to articulate a rationale for his methodology; nor is it a case where the proffered rationale is patently flawed or unreasonable . . . . It is for the jury to determine whether the methodological decisions that [defendants' expert] made render his analysis either more or less persuasive than [plaintiffs' expert's] model.").

### B. Motion for Class Certification

For a matter to proceed as a class action, a plaintiff must first satisfy four requirements: 1) numerosity ("the class is so numerous that joinder of all members is impracticable"); 2) commonality ("there are questions of law or fact common to the class"); 3) typicality ("the claims or defenses of the representative parties are typical of the claims or defenses of the class"); and 4) adequacy of representation ("the representative parties will fairly and adequately protect the interests of the class").  Fed. R. Civ. P. 23(a).  In addition, the Second Circuit has also "'recognized an implied requirement of ascertainability in Rule 23,' which demands that a class be 'sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member.'"  *In re Petrobras Securities*, 862 F.3d 250, 260 (2d Cir. 2017) (quoting *Brecher v. Republic of Argentina*, 806 F.3d 22, 24 (2d Cir. 2015)).

Assuming the requirements of Rule 23(a) are met, a class action may only be maintained if the Plaintiff also qualifies the proposed class under one of the categories in Rule 23(b).  Fed. R. Civ. P. 23(b).  Here, Plaintiff seeks to certify the class under Rule 23(b)(2) and Rule 23(b)(3). (Dkt. No. 69-1, pp. 19-29).  Certification of a class under Rule 23(b)(2) is appropriate in cases where the defendant "has acted or refused to act on grounds generally applicable to the class," thus entitling class members to "final injunctive relief."  Fed. R. Civ. P. 23(b)(2).  The court may

certify a Rule 23(b)(3) class if it "finds that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The party seeking class certification bears the burden of satisfying Rule 23's requirements by a preponderance of the evidence. *Goldemberg v. Johnson & Johnson Consumer Companies, Inc.*, 317 F.R.D. 374, 384 (S.D.N.Y. 2016). Thus, "a court must 'probe behind the pleadings before coming to rest on the certification question,' satisfying itself that Rule 23 compliance may be demonstrated through 'evidentiary proof.'" *Johnson v. Nextel Commun. Inc.*, 780 F.3d 128, 138 (2d Cir. 2015) (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 23 (2013)). "[T]his inquiry may sometimes overlap with merits issues, though the determination as to a Rule 23 requirement is not binding on the trier of fact in its determination of the merits." *Id.* "Furthermore, in order to certify a class, the proponent of class certification need not show that the common questions 'will be answered, on the merits, in favor of the class.'" *Id.* (quoting *Amgen Inc. v. Connecticut Ret. Plans and Tr. Funds*, 568 U.S. 455, 459 (2013)). While the requirements "are to be applied liberally," the court must still "conduct a rigorous analysis of the criteria set forth in Rule 23." *Friedman-Katz v. Lindt & Sprungli (USA), Inc.*, 270 F.R.D. 150, 153-54 (S.D.N.Y. 2010). "A district judge is to assess all of the relevant evidence admitted at the class certification stage and determine whether each Rule 23 requirement has been met, just as the judge would resolve a dispute about any other threshold prerequisite for continuing a lawsuit." *In re Initial Pub. Offerings Securities Litig.*, 471 F.3d 24, 42 (2d Cir. 2006).

### 1) Rule 23(a) Requirements

#### a. Numerosity

Rule 23(a)(1) first requires that the proposed class be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). In general, "numerosity is presumed at a level of 40 members." *Consol. Rail Corp. v. Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995). Here, numerosity is not in dispute.[9] Although Plaintiff does not estimate the number of members in the proposed class of all persons in New York who purchased Tito's Handmade Vodka from April 12, 2012 through the present, Plaintiff points to evidence of extensive sales of Tito's vodka in New York, thereby satisfying his burden of showing numerosity.

#### b. Commonality[10]

Next, a plaintiff seeking class certification must show "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). "The critical inquiry is whether the common questions are at the core of the cause of action alleged." *Friedman-Katz*, 270 F.R.D. at 155 (quoting *Labbate–D'Alauro v. GC Servs. Ltd. Pshp.*, 168 F.R.D. 451, 456 (E.D.N.Y. 1996)). Even a single common question may suffice, but it "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 564 U.S. at 350. The common question(s) must generate "common answers apt to drive the resolution of the litigation." *Id.* (citation omitted).

---

[9] Defendant specifically indicated in a letter regarding discovery that it does not contest the numerosity requirement in this case. (Dkt. No. 55, p. 2).

[10] The Second Circuit has observed that "[t]he commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997).

Plaintiff asserts that common questions in this case include: "(i) whether the 'handmade' representations that appear on every label and in every advertisement of Tito's are false and misleading; (ii) whether Defendant intentionally misrepresented that Tito's was 'handmade'; (iii) whether 'handmade' was important to a reasonable consumer; and (iv) whether the Class paid a price premium as a result of these allegedly false and misleading representations." (Dkt. No. 69-1, pp. 15-16). Defendant argues that Plaintiff cannot show commonality because, among other things, "there is no common experience for the class." (Dkt. No. 87, p. 15). But Defendant's arguments are better aimed at the related and "more exacting" predominance requirement, *Goldemberg*, 317 F.R.D. at 399, which the Court will discuss below in Part IV(B)(3)(a).[11]

Here, Plaintiff's common questions go to the heart of the claims in this case. Section 349 of New York's General Business Law ("GBL") prohibits deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in New York State. N.Y. Gen. Bus. Law § 349(a). To prove a claim, a plaintiff must show: "(1) that the defendant's acts were consumer oriented, (2) that the acts or practices are deceptive or misleading in a material way, and (3) that the plaintiff has been injured as a result." *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 8 F. Supp. 3d 467, 478 (S.D.N.Y. 2014) (internal quotation and citation omitted). "The New York Court of Appeals has established an objective standard for determining whether acts or practices are materially deceptive or misleading 'to a reasonable consumer acting reasonably under the circumstances.'" *Id.* (quoting *Oswego*

---

[11] *See also Johnson v. Nextel Commun. Inc.*, 780 F.3d 128, 140 (2d Cir. 2015) ("We need not decide, however, whether each of plaintiffs' ten issues are properly treated as common or individual. In the context of a Rule 23(b)(3) class certification, the issues raised by Nextel are more efficiently addressed in light of the predominance and superiority requirements of Rule 23(b)(3).").

*Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995)).  It is well-established that paying a premium for a product can constitute an actual injury under GBL § 349.  *Id.* at 481-82 (citing cases).  Similarly, for intentional misrepresentation, "a plaintiff must show that: (1) the defendant made a material false statement or omission; (2) the defendant intended to defraud the plaintiff; (3) the plaintiff reasonably relied upon the representation or omission; and (4) the plaintiff suffered damage as a result of such reliance."  *B & M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 2d 474, 480 (S.D.N.Y. 2010) (internal quotation and citation omitted).

Ultimately, answers to the questions raised by Plaintiff will address issues that are central to the class claims, particularly whether the "handmade representation" was materially false or misleading and caused consumers to pay a premium, and thus drive the resolution of the case. Therefore, the Court finds that Plaintiff has satisfied the commonality requirement.  *See Hughes v. The Ester C Co.*, 317 F.R.D. 333, 345 (E.D.N.Y. 2016), *reconsideration denied sub nom. Hughes v. Ester C. Co.*, No. 12 Civ. 41, 2017 WL 3129767, 2017 U.S. Dist. LEXIS 114224 (E.D.N.Y. July 21, 2017) (finding that commonality requirement was satisfied where the question of  "whether or not a reasonable consumer was misled by Defendants' 'The Better Vitamin C' representation, presents a single unifying thread among the members' claim") (citation omitted); *Goldemberg*, 317 F.R.D. at 399 (common questions included "When the 'Active Naturals®' representation is combined with a particular product's packaging and labeling, what does the marketing combination mean to a reasonable consumer?", "For any particular Active Naturals product, is Defendant's marketing combination materially misleading?", "Did class members pay a price premium as a result of the combined

27

representation?", and "Was that premium—to the extent that it can be reasonably ascertained—relatively uniform?"); *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 405 (S.D.N.Y. 2015) (common question in class action brought under GBL § 349 regarding grass seed was "whether the 50% thicker claim is false and/or misleading"); *see also Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 62 (E.D.N.Y. 2015), *reconsideration denied*, 140 F. Supp. 3d 241 (E.D.N.Y. 2015); *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 565 (S.D.N.Y. 2014).

### c. Typicality

Typicality "requires that the claims of the class representatives be typical of those of the class." *Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care. L.L.C.*, 504 F.3d 229, 245 (2d Cir. 2007) (internal quotation marks and citation omitted). This requirement is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993) (citations omitted). "In short, the test for typicality is not demanding." *Pyke v. Cuomo*, 209 F.R.D. 33, 42 (N.D.N.Y. 2002) (quotations and citations omitted). "Consumers of the same product, exposed to the same marketing and packaging, will have almost entirely the same claims with at most 'minor variations' in the facts surrounding their purchase of the products." *Goldemberg*, 317 F.R.D. at 400 (quoting *Robidoux*, 987 F.2d at 937).

28

Plaintiff asserts that he is "typical of the Class because he saw the same uniform misrepresentations as the Class, was damaged in the same way (by paying a price premium for Tito's), and his legal theory is the same as the Class." (Dkt. No. 69-1, p. 17).  Defendant counters that Plaintiff is not typical of the class because his "actual experience is not the one he pleads for the class" since he "could not have relied on the label, as he alleges the other class members did." (Dkt. No. 87, p. 30).  Specifically, Defendant points to Plaintiff's testimony that he first tried Tito's when he was working at a restaurant, he liked the taste, and thus he "was already familiar with Tito's . . . before he made his first purchase." (*Id.*, pp. 11-12).  However, Plaintiff also testified that his boss at the restaurant told him Tito's was "handmade," that she "was going off the label basically," and that he first purchased Tito's because he liked the taste *and* because "it was handmade." (Dkt. No. 92-1, pp. 88, 92).  Thus, although Plaintiff had some familiarity with Tito's before he purchased it, he nonetheless has the same fundamental claim as the class he seeks to represent: that he bought the vodka based on (at least in part) the "handmade representation."  Moreover, there is no dispute that the alleged unlawful conduct here was directed at both Plaintiff and the proposed class.  Accordingly, Plaintiff has satisfied the typicality requirement.  *See Ebin*, 297 F.R.D. at 565 (finding typicality where "the lead plaintiffs' and other class members' claims arise out of the same course of conduct by the defendant and are based on the same legal theories").

### d.  Adequacy of Representation

Plaintiff must also demonstrate that he "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a)(4).  "Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and

2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*, 222 F.3d 52, 60 (2d Cir. 2000). In other words, the Plaintiff must be "prepared to prosecute fully the action and have no known conflicts with any class member." *Shahriar v. Smith & Wollensky Rest. Group, Inc.*, 659 F.3d 234, 253 (2d Cir. 2011). Plaintiff asserts that he "has demonstrated he is committed to pursuing claims on behalf of the Class by responding to written discovery requests, producing documents, and sitting for a deposition," and further, that he "has also demonstrated a thorough understanding of his basis of his claims and his role as a class representative." (Dkt. No. 69-1, p. 18). Defendant suggests that Plaintiff is not an adequate representative since he is not a typical one. (Dkt. No. 87, pp. 29-30). However, this argument is unavailing for the same reasons discussed above.[12] Moreover, Plaintiff asserts that his counsel "has significant litigation and class action experience and has litigated numerous consumer fraud class action lawsuits in both state and federal court." (Dkt. No. 69-1, p. 19). Defendant does not dispute that Plaintiff's counsel are capable of protecting the interests of the class. Therefore, Plaintiff has satisfied the adequacy requirement.

### e. Ascertainability

The Second Circuit recently clarified that "[t]he ascertainability doctrine that governs in this Circuit requires only that a class be defined using objective criteria that establish a membership with definite boundaries." *In re Petrobras Securities*, 862 F.3d at 264. "This modest threshold requirement will only preclude certification if a proposed class definition is indeterminate in some fundamental way." *Id.* at 269. The Circuit expressly "decline[d] to adopt

---

[12] *See also Rodriguez v. It's Just Lunch, Intern.*, 300 F.R.D. 125, 146 (S.D.N.Y. 2014) ("Because the ultimate merits of Berkowitz's claim are not relevant to determining whether Berkowitz is an adequate class representative, the Court does not—and indeed is prohibited from—evaluating the merits now.").

a heightened ascertainability theory that requires a showing of administrative feasibility at the class certification stage."  *Id.* at 265.

Plaintiff asserts that the proposed class of Tito's purchasers can be ascertained "by sworn affidavits, receipts, rewards cards, and/or credit cards."  (Dkt. No. 69-1, p. 30).  In response, Defendant argues that since it "does not sell directly to consumers, or even retailers, it will be difficult at best to determine who the class members are, as most are unlikely to have retained itemized receipts of their vodka purchases going back five years."  (Dkt. No. 87, p. 31).  However, "[a]scertainability does not directly concern itself with the plaintiffs' ability to offer *proof of membership* under a given class definition, an issue that is already accounted for in Rule 23."  *In re Petrobras Securities*, 862 F.3d at 269.  The question is not how difficult or practical ascertaining class members will be, but rather whether doing so is "objectively *possible*."  *Id.* at 270.  A number of courts have observed that, in the absence of receipts for products, sworn affidavits and other forms of proof may suffice to ascertain class membership.  *See, e.g., Goldemberg*, 317 F.R.D. at 399 ("[T]he Court concludes that the implied ascertainability requirement of Rule 23 can, at minimum, be met on the basis of sworn statements indicating class members purchased the products at issue in the necessary state during the necessary limitations period.").  Accordingly, Plaintiff has met the modest ascertainability requirement. *See also Kurtz*, 2017 WL 1155398, at *45, 2017 U.S. Dist. LEXIS 44576, at *127-28 ("Because it is unlikely that consumers will retain receipts, plaintiff may rely on affidavits for those without a receipt. Plaintiff may also identify some consumers via electronic purchase records, where possible."); *Belfiore*, 311 F.R.D. at 66 (same).

31

### f.   Summary

The Court finds that Plaintiff has met all of the preliminary requirements for certification under Rule 23(a).  Thus, the next question is whether Plaintiff has satisfied the requirements to certify a class under Rule 23(b).

### 2)   Rule 23(b)(2) Requirements

Plaintiff seeks an injunction, pursuant to GBL § 349, permanently enjoining Defendant from engaging in the alleged deceptive acts or practices.  (Dkt. No. 1, p. 17).  Plaintiff also seeks an injunction "requiring Defendant to adequately disclose the information" regarding the alleged true nature of its manufacturing process, i.e. that it is made in "massive buildings containing ten floor-to-ceiling stills and bottling 500 cases an hour."  (*Id.*, ¶¶ 44, 51).  Rule 23(b)(2) allows class certification when "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  Fed. R. Civ. P. 23(b)(2).  "Rule 23(b)(2) applies only when a single injunction or declaratory judgment would provide relief to each member of the class."  *Wal-Mart Stores, Inc.*, 564 U.S. at 360.  "When a class seeks an indivisible injunction benefitting all its members at once, there is no reason to undertake a case-specific inquiry into whether class issues predominate or whether class action is a superior method of adjudicating the dispute.  Predominance and superiority are self-evident."  *Id.* at 362-63.  This type of class action is "intended for cases where broad, class-wide injunctive or declaratory relief is necessary to redress a group-wide injury."  *Robinson v. Metro–North Commuter R.R.*, 267 F.3d 147, 162 (2d Cir. 2001), *abrogated on other grounds by Wal-Mart Stores, Inc.*, 564 U.S. 338.

Plaintiff asserts that this case "qualifies for injunctive relief because Defendant's uniform and deceptive labeling and advertisements apply to all Class members and injunctive relief will protect the rights of all consumers." (Dkt. No. 69-1, p. 28) (citation omitted). In opposition, Defendant argues that Plaintiff "does not have standing to seek injunctive relief on behalf of the putative class" since he "cannot demonstrate that there is a real and imminent threat of future injury because he no longer buys vodka." (Dkt. No. 159, p. 1).[13]

"Article III limits federal judicial power to the resolution of 'Cases' and 'Controversies.'" *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 239 (2d Cir. 2016) (quoting U.S. Const. art. III, § 2). "To satisfy this jurisdictional requirement, '(1) the plaintiff must have suffered an injury-in-fact; (2) there must be a causal connection between the injury and the conduct at issue; and (3) the injury must be likely to be redressed by a favorable decision.'" *Id.* (quoting *Jewish People for the Betterment of Westhampton Beach v. Vill. of Westhampton Beach*, 778 F.3d 390, 394 (2d Cir. 2015)). "For each form of relief sought, a plaintiff 'must demonstrate standing separately.'" *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)). "A plaintiff seeking to represent a class must personally have standing." *Id.*

When seeking prospective injunctive relief, the plaintiff must show a likelihood of either future harm or continuing harm. *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983); *see also Carver v. City of New York*, 621 F.3d 221, 228 (2d Cir. 2010). "Plaintiffs lack standing to pursue

---

[13] By Order dated August 28, 2017, the Court directed the parties to submit supplemental briefing on the motion to certify, "addressing the question of whether the Plaintiff has standing to seek injunctive relief on behalf of the proposed class." (Dkt. No. 156). Although this issue was not originally raised by the parties in the briefing on the motion to certify, it is well-established that "[b]ecause the standing issue goes to this Court's subject matter jurisdiction, it can be raised *sua sponte*." *C. States S.E. and S.W. Areas Health and Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 433 F.3d 181, 198 (2d Cir. 2005).

injunctive relief where they are unable to establish a 'real or immediate threat' of injury."
*Nicosia*, 834 F.3d at 239 (quoting *City of Los Angeles*, 461 U.S. at 111).  "Although past injuries
may provide a basis for standing to seek money damages, they do not confer standing to seek
injunctive relief unless the plaintiff can demonstrate that she is likely to be harmed again in the
future in a similar way."  *Id.*

 Plaintiff testified that since this case was filed in 2015, he has not bought any vodka and
has switched to drinking whiskey.  (Dkt. No. 92-1, p. 93).  Nonetheless, Plaintiff argues that he
has standing because "defendant's deceptive conduct presents a continuing threat of harm to the
plaintiff and consumers who are exposed to it."  (Dkt. No. 160, p. 2).  However, absent any
indication that Plaintiff intends to buy Tito's vodka again, there is no continuing threat of harm
to him, and any injury based on "exposure" alone is simply too abstract to confer standing.  *See*
*Shain v. Ellison*, 356 F.3d 211, 215 (2d Cir. 2004) ("[A]bstract injury is not enough; rather, the
injury or threat of injury must be both real and immediate, not conjectural or hypothetical.'")
(internal quotations and formatting omitted) (citing *O'Shea v. Littleton*, 414 U.S. 488, 494
(1974); *Golden v. Zwickler*, 394 U.S. 103, 109-10 (1969)).

 Plaintiff also suggests that the Court should carve out a public policy exception to the
standing requirement, in the interest of protecting other consumers.  (Dkt. No. 160, pp. 3-5).
While a few courts appear to have done so, the weight of authority compels the conclusion that
Article III must be strictly interpreted.  "The Second Circuit has not directly addressed whether
plaintiffs alleging claims of false or misleading advertising have standing to seek injunctive
relief where the action the plaintiffs seek to enjoin is still ongoing."  *Atik v. Welch Foods, Inc.*,
No. 15 Civ. 5405, 2016 WL 5678474, at *5, 2016 U.S. Dist. LEXIS 136056, at *14 (E.D.N.Y.

Sept. 30, 2016).[14]  However, "the requirement that a plaintiff allege a risk of future injury in order to obtain injunctive relief is a constitutional requirement that all plaintiffs must satisfy." *Id.*  Accordingly, where, as here, a plaintiff stops buying an allegedly deceptive product, he lacks standing to seek prospective injunctive relief regarding that product because there is no risk of future injury.[15]  *See id.* (finding that the plaintiffs lacked standing to seek injunctive relief since they "failed to allege a risk of future injury"); *see also Marino v. Coach, Inc.*, No. 16 Civ. 1122, 2017 WL 3731954, at *4, 2017 U.S. Dist. LEXIS 138865, at *15 (S.D.N.Y. Aug. 28, 2017) ("The Court finds that Plaintiffs lack standing to seek injunctive relief because they do not allege any actual or imminent risk of future injury."); *Kommer v. Bayer Consumer Health*, No. 16 Civ. 1560, 2017 WL 2231162, at *4, 2017 U.S. Dist. LEXIS 84671, *11 (S.D.N.Y. May 18, 2017) (finding that the plaintiff lacked standing where he "essentially concedes that he will not buy [the defendants' products], or be misled by Defendants' marketing, again in the future"); *Langan v. Johnson & Johnson Consumer Companies, Inc.*, 2017 WL 985640, at *10, 2017 U.S. Dist. LEXIS 35703, at *32 (D. Conn. Mar. 13, 2017) (finding that the plaintiff did not have standing where, among other things, "she admitted in her deposition that she does not intend to buy the [defendant's] products again"); 1 MCLAUGHLIN ON CLASS ACTIONS § 4:28 (13th ed.) ("In the

---

[14] Although *Nicosia* did not address the standing issue in the GBL § 349 context under these precise circumstances (the defendant had stopped selling the weight loss product in question), the Circuit explained that the plaintiff lacked standing where he "failed to allege that he intends to use Amazon in the future to buy *any* products, let alone food or drug products generally or weight loss products in particular."  834 F.3d at 239.  Therefore, the plaintiff "did not establish a likelihood of future or continuing harm."  *Id.*

[15] Plaintiff also argues that strictly interpreting the standing requirement "would eviscerate injunctive relief in deceptive advertising cases."  (Dkt. No. 160, p. 3).  However, "[i]njunctive relief remains available to similarly situated plaintiffs in state court."  *Marino v. Coach, Inc.*, No. 16 Civ. 1122, 2017 WL 3731954, at *4, 2017 U.S. Dist. LEXIS 138865, at *15 (S.D.N.Y. Aug. 28, 2017).

consumer context, a plaintiff has standing to seek injunctive relief individually and on behalf of a class only if he or she has expressed an intent to purchase the product in the future.").

Accordingly, the Court finds that since Plaintiff has stopped buying Tito's vodka, Plaintiff has not shown any likelihood that he will be injured in the future by Defendant's allegedly deceptive acts or practices involving Tito's vodka.  In sum, Plaintiff lacks standing to pursue injunctive relief in this case because he has failed to establish a "real or immediate threat" of future injury.  Without standing, Plaintiff may not represent the proposed class for purposes of seeking injunctive relief.  *Nicosia*, 834 F.3d at 239 ("A plaintiff seeking to represent a class must personally have standing.").  Therefore, Plaintiff's motion to certify a class under Rule 23(b)(2) is denied.[16]

### 3)  Rule 23(b)(3) Requirements

For certification under Rule 23(b)(3), Plaintiff must establish that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

### a.  Predominance

### i.  Standard

"A district court may only certify a class under Federal Rule of Civil Procedure 23(b)(3) if 'questions of law or fact common to class members predominate over any questions affecting

---

[16] Since Plaintiff lacks standing, the Court need not address Defendant's argument that "the injunctive relief [Plaintiff] seeks—a label change—cannot be effected without approval by the TTB" (United States Alcohol and Tobacco Tax and Trade Bureau), and therefore his "bid for this relief is an effective collateral challenge to the TTB's jurisdiction."  (Dkt. No. 87, p. 30).

only individual members.'" *In re Petrobras Securities*, 862 F.3d at 270.  The predominance

requirement is satisfied if: "(1) resolution of any material legal or factual questions can be

achieved through generalized proof, and (2) these common issues are more substantial than the

issues subject only to individualized proof." *Id.* (internal quotations, citations, and formatting

omitted).  The distinction between individual and common questions is "central to the

predominance analysis." *Id.*  The Supreme Court has explained that "[a]n individual question is

one where members of a proposed class will need to present evidence that varies from member to

member, while a common question is one where the same evidence will suffice for each member

to make a prima facie showing [or] the issue is susceptible to generalized, class-wide proof."

*Tyson Foods, Inc. v. Bouaphakeo*, __ U.S. __, 136 S. Ct. 1036, 1045 (2016) (citation omitted).

      The predominance requirement is "far more demanding" than the commonality

requirement under Rule 23(a), and it is not satisfied "simply by showing that the class claims are

framed by the common harm suffered by potential plaintiffs." *Amchem Products, Inc. v.

Windsor*, 521 U.S. 591, 624 (1997).  "The Rule 23(b)(3) predominance inquiry tests whether

proposed classes are sufficiently cohesive to warrant adjudication by representation." *Id.* at 623.

"Where individualized questions permeate the litigation, those 'fatal dissimilarit[ies]' among

putative class members 'make use of the class-action device inefficient or unfair.'" *In re

Petrobras Securities*, 862 F.3d at 270 (quoting *Amgen Inc.*, 568 U.S. at 470).

      "The predominance inquiry mitigates this risk by 'ask[ing] whether the common,

aggregation-enabling, issues in the case are *more prevalent or important* than the non-common,

aggregation-defeating, individual issues." *In re Petrobras Securities*, 862 F.3d at 270 (quoting

*Tyson Foods, Inc.*, 136 S. Ct. at 1045).  For this reason, courts must give "careful scrutiny to the

relation between common and individual questions in a case." *Tyson Foods, Inc.*, 136 S. Ct. at 1045. This analysis is "more qualitative than quantitative," and must account for "the nature and significance of the material common and individual issues in the case." *In re Petrobras Securities*, 862 F.3d at 271 (citation omitted).

### ii.  Application

Plaintiff asserts that common questions of law and facts predominate as to his proposed class claims for violation of GBL § 349 and intentional misrepresentation. (Dkt. No. 69-1, pp. 20-24). However, the parties dispute whether common proof can establish the key elements of materiality, reliance, causation, injury, and damages.

### 1.  Materiality

Plaintiff argues that "whether the 'handmade' representation is misleading turns entirely on generalized evidence concerning how Tito's is made and what 'handmade' conveys to a reasonable consumer." (Dkt. No. 69-1, p. 21). In response, Defendant asserts that "whether the label is deceptive or misleading in a material way is an uncommon question," requiring individualized proof. (Dkt. No. 87, p. 17). Specifically, Defendant argues that: 1) "'handmade' is in the eye of the beholder"; 2) "'crafted in an old-fashioned pot still' is entirely accurate"; and 3) "perceptions of 'quality' are highly individualized." (*Id.*, pp. 18-23).

However, "materiality" as it pertains to the claims in this case is an objective inquiry: Plaintiff must show that the "handmade representation" on Defendant's labeling and packaging[17]

---

[17] There is no dispute that the "handmade representation" appeared on all Tito's vodka bottle labels and packaging during the Class Period. Plaintiff also asserts that Defendant's advertisements frequently describe Tito's as a "craft vodka" which is "made in small batches." (Dkt. No. 69-1, p. 8). Plaintiff further indicates that Defendant's website contains an outdated "video montage" which portrays Tito's "as being made in a single distillery building, in 175

38

was "likely to mislead a reasonable consumer acting reasonably under the circumstances."

*Orlander v. Staples, Inc*., 802 F.3d 289, 300 (2d Cir. 2015) (discussing claims under GBL § 349)

(citing *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007); *Oswego Laborers'*

*Local 214 Pension Fund*, 85 N.Y.2d at 26); *see also Amgen Inc.*, 568 U.S. at 459 ("Because

materiality is judged according to an objective standard, the materiality of Amgen's alleged

misrepresentations and omissions is a question common to all members of the class [the plaintiff]

would represent.  The alleged misrepresentations and omissions, whether material or immaterial,

would be so equally for all investors composing the class.") (discussing fraud claims).

Since materiality is an objective question, it follows that it can be proven with

generalized class-wide evidence.[18]  *See Goldemberg*, 317 F.R.D. at 389 ("The product specific

---

gallon sized pot stills, and with gravity-fed bottling, despite the fact none of this is true today." (*Id.*, pp. 8-9). However, since the representations about Tito's vodka in advertisements and the website video appear to have varied significantly, any claims based on exposure to those representations would involve individualized questions and fatal dissimilarities among class members, and therefore, are not suitable for class treatment. *See Goldemberg*, 317 F.R.D. at 389 ("[T]he advertising claims, which would require individualized showings as to exposure to the company's website or Facebook page . . . are not suitable for inclusion in the proposed class.  The product specific labeling and packaging claims, however, do not require proof as to individual understandings and can be judged based on the objective standard provided."); *In re Avon Anti-Aging Skincare Creams and Products Mktg. and Sales Practices Litig.*, No. 13 Civ. 150, 2015 WL 5730022, at *4, 2015 U.S. Dist. LEXIS 133484, at *13 (S.D.N.Y. Sept. 30, 2015) (finding that claims involving brochures with varying representations were inappropriate for class treatment); *Solomon v. Bell A. Corp.*, 777 N.Y.S.2d 50, 55 (N.Y. App. Div. 1st Dept. 2004) ("certification of a class for purposes of an action brought under GBL §§ 349 and 350 may be appropriate where the plaintiffs allege that all members of the class were exposed to the same misrepresentations"); *see also Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002) (differentiating between fraud claims "based on uniform misrepresentations made to all members of the class and fraud claims based on individualized misrepresentations," with only the former being suitable for class treatment "because the standardized misrepresentations may be established by generalized proof").

[18] Although Defendant argues there is no definition for "handmade" in the industry or used by the TTB (Dkt. No. 87, p. 18), that is not dispositive of the objective reasonable consumer inquiry as to materiality.  Defendant also argues that  "handmade" as used in connection with alcohol distillation is non-actionable "puffery," and that "'crafted in an old fashioned pot still' is entirely accurate."  *See*, *e.g.*, *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 644 (S.D.N.Y. 2011), *reconsideration granted in part on other grounds*, No. 08 Civ. 9628, 2011 WL 5121068, 2011 U.S. Dist. LEXIS 125068 (S.D.N.Y. Oct. 28, 2011) ("Puffery includes generalized or exaggerated statements which a reasonable consumer would not interpret as a factual claim upon which he could rely.").  The Court has, however, already ruled that Plaintiff has plausibly alleged that Tito's label could mislead a reasonable consumer.  (Dkt. No. 32, pp. 21-22).  Defendant's argument on the merits will be considered at the summary judgment stage.

labeling and packaging claims, however, do not require proof as to individual understandings and can be judged based on the objective standard provided. . . . The materiality of potentially deceptive representations is similarly subject to objective proof.").[19]  Here, Plaintiff has proffered an expert report from Krosnick which addresses the issue of materiality.  Krosnick discusses a survey he performed to assess the impact of the "handmade representation" on consumers' perception of quality.  Krosnick states that the survey results "indicate that people who read only the label on Tito's Handmade Vodka bottles rated the product as having significantly higher quality than did people who also read the corrective statement from Forbes," and thus, "the allegedly misleading information on the label is material to a reasonable consumer."  (Dkt. No. 69-2, p. 281).

Although Defendant argues that Krosnick's methodology is flawed, and offers related rebuttal experts, these critiques go to the weight of his opinions, as discussed above.[20] Defendant has also attempted to show through its own experts, particularly Butler, that the "handmade representation" is not in fact material, but resolution of this issue would be premature.  At this stage, Plaintiff is not required to definitively prove materiality, but rather simply to show that it *can be* proven.  In this regard, the Court finds that Krosnick's report is

---

[19] *See also Kurtz*, 2017 WL 1155398, at *56, 2017 U.S. Dist. LEXIS 44576, at *158-59 ("The question of whether the 'flushable' label was material to a reasonable consumer's decision to purchase is an objective inquiry that focuses on that packaging.") (internal quotation and citation omitted); *Hughes*, 317 F.R.D. at 351 ("Materiality is a question common to all members of the class when, as here, the materiality of an alleged misrepresentation is judged according to an objective standard.") (internal quotation and citation omitted); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 410 ("[M]ateriality 'is a question common to all members of the class' when, as here, the materiality of an alleged misrepresentation is judged according to an objective standard.") (quoting *Amgen Inc.*, 568 U.S. at 459); *Belfiore*, 311 F.R.D. at 70 (same).

[20] Moreover, Krosnick's second report cogently addresses many of Defendant's critiques.  (Dkt. No. 116, pp. 19-56). Krosnick also proposes to conduct another materiality survey using "the same general survey methodology . . . in a slightly different way to provide assurances about the robustness of the results."  (*Id.*, pp. 56-57).

sufficient to show that the materiality of the "handmade representation" can be proven through general class-wide evidence. *See Amgen Inc.*, 568 U.S. at 468 ("under the plain language of Rule 23(b)(3), plaintiffs are not required to prove materiality at the class-certification stage"); *see also Ackerman v. Coca-Cola Co.*, No. 09 Civ. 395, 2013 WL 7044866, at \*23, 2013 U.S. Dist. LEXIS 184232, at \*95 (E.D.N.Y. July 18, 2013) ("To the extent these expert reports are relevant, it is to the question of whether a reasonable consumer would find vitaminwater's labeling or marketing misleading or deceptive, which is a merits-based inquiry."); *Jamie Pettit v. Proctor & Gamble Company*, No. 15 Civ. 2150, 2017 WL 3310692, at \*4, 2017 U.S. Dist. LEXIS 122668, at \*10-11 (N.D. Cal. Aug. 3, 2017) ("[W]hile Pettit may need to bolster her showing if she hopes to prevail at trial, for purposes of the present motion she has adequately established that common proof can answer on a class-wide basis the critical central question as to whether P&G's labeling of Freshmates as 'flushable' gives rise to a probability that a significant portion of the relevant consumers acting reasonably could be misled. Furthermore, by the same token, Pettit has made a sufficient showing that materiality can be resolved on a class-wide basis."); *Allen v. Hylands Inc.*, No. 12 Civ. 1150, 2015 WL 12720304, at \*14, 2015 U.S. Dist. LEXIS 186799, at \*44 (C.D. Cal. Aug. 20, 2015) ("Dr. Krosnick's study is therefore both sufficiently reliable and helpful to the jury in determining the materiality of the statements made on Defendants' label in judging the efficacy of the products.").

### 2.  Reliance & Causation

Defendant also contends that common issues do not predominate in this case because "causation can only be demonstrated on a case-by-case basis." (Dkt. No. 87, p. 23). Defendant asserts that "there is no basis for Singleton's assumption that the term handmade—as opposed to

taste or other factors—caused many class members to purchase Tito's at any price." (*Id.*, p. 24). However, Defendant's argument goes to the issue of reliance, not causation, and it is well-established that an action "brought under § 349 does not require proof of actual reliance." *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005); *see also Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 (N.Y. 2000) ("[A]s we have repeatedly stated, reliance is not an element of a section 349 claim.").

Indeed, courts in various consumer class actions have rejected the notion that individualized proof of reliance is necessary for a GBL § 349 claim. *See Goldemberg*, 317 F.R.D. at 392 ("For claims brought under New York's GBL, it does not matter whether a plaintiff justifiably relied on the deception."); *Belfiore*, 311 F.R.D. at 69 ("individualized proof of reliance is not necessary for § 349 claims") (citation omitted); *Ackerman*, 2013 WL 7044866, at *2, 2013 U.S. Dist. LEXIS 184232, at *7 ("GBL § 349 does not require proof that any consumer relied on a misrepresentation."); *Guido v. L'Oreal, USA, Inc.*, No. 11 Civ. 1067, 2013 WL 3353857, at *12, 2013 U.S. Dist. LEXIS 94031, at *32 (C.D. Cal. July 1, 2013) ("A claim for deceptive business practices pursuant to § 349 does not require a demonstration of reliance."). In *Goldemberg*, the court explained that "it is precisely because of the inherent harm in purchasing a product at an inflated price that the consumer protection statutes here provide for an inference of reliance when the misleading act is material, or when it can be assumed that the price premium is related to the deceptive conduct." 317 F.R.D. at 395 (discussing GBL § 349, among other statutes).

To prevail on a GBL § 349 claim, however, a plaintiff "must show that the defendant's 'material deceptive act' caused the injury." *Stutman*, 731 N.E.2d at 612 (citation omitted). Here,

42

Plaintiff's theory of liability is that Defendant's "handmade representation" caused the proposed class an injury in the form of a purchase price premium.  Proving causation would not require inquiries as to the various reasons why each class member purchased Tito's vodka.  Rather, assuming materiality, Plaintiff argues that causation can be proven with a class-wide damages model isolating the effect of the "handmade representation," an issue that the Court will discuss separately below.  *See Weiner v. Snapple Bev. Corp.*, No. 07 Civ. 8742, 2010 WL 3119452, at *6, 2010 U.S. Dist. LEXIS 79647, at *17 (S.D.N.Y. Aug. 5, 2010) ("Only by showing that plaintiffs in fact paid more for Snapple beverages as a result of Snapple's 'All Natural' labeling can plaintiffs establish the requisite elements of causation and actual injury under § 349.  At the class certification stage, plaintiffs may demonstrate that these elements are susceptible to generalized proof by disclosing a suitable methodology.").

On the other hand, reliance is an element of an intentional misrepresentation claim, and class members must also show that they "suffered damage as a result of such reliance."  *B & M Linen, Corp.*, 679 F. Supp. 2d at 480.  Similarly, the Second Circuit has observed in the RICO context that a plaintiff must "demonstrate reliance on a defendant's common misrepresentation to establish causation."  *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d at 119.  Thus, certification is inappropriate "where reliance is too individualized to admit of common proof."  *Id.* (quoting *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008)).  "The fact that class members will show causation by establishing reliance on a defendant's misrepresentations, however, does not place fraud-based claims entirely beyond the reach of Rule 23, provided that individualized issues will not predominate."  *Id.*  Here, the Court finds that, for purposes of the

43

intentional misrepresentation claim only, showing reliance and causation would require individualized proof as to the purchasing decision of each class member.[21]  The Court will evaluate the impact of these issues on the overall predominance analysis, as discussed below. *See also Amgen Inc.*, 568 U.S. at 463 (noting that in some cases "individual reliance issues would overwhelm questions common to the class").

### 3.   Injury & Damages

Plaintiff asserts that "the injury to Plaintiff and the Class is subject to common proof" by calculating the price premium for Tito's vodka caused by Defendant's allegedly deceptive "handmade representation."  (Dkt. No. 69-1, p. 22).  Plaintiff further indicates that a damages model "tied to his theory of liability" can be used to determine damages on a class-wide basis. (*Id.*, p. 24).  The Court's analysis in this area is guided by the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).  There, the plaintiffs brought a proposed antitrust class action against the defendants, with liability premised on four different theories of antitrust impact, including that "Comcast's activities reduced the level of competition from 'overbuilders,' companies that build competing cable networks in areas where an incumbent cable company already operates."  *Id.* at 31.  The district court accepted this particular theory as

---

[21] The Second Circuit has also recognized that in some cases, "plaintiffs may be able to prove class-wide causation based on first-party reliance *without* an individualized inquiry into whether each class member relied on the defendant's misrepresentation if 'circumstantial evidence' generates a sufficiently strong inference that all class members did, in fact, rely."  *Sergeants Benv. Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 88 (2d Cir. 2015), *cert. denied sub nom. Sergeants Benev. Ass'n Health and Welfare Fund v. Sanofi-Aventis U.S. LLP*, __ U.S. __, 137 S. Ct. 140 (2016).  Thus, "[i]n certain factual contexts, it may well be reasonable to infer that each class member would only have taken the action leading to its injury if it had relied on the defendant's alleged misrepresentation.  Such an inference may be available if, for example, the class members all faced the same more-or-less one-dimensional decisionmaking process, such that the alleged misrepresentation would have been essentially determinative for each plaintiff."  *Id.* (internal quotations and citation omitted).  However, in this case, the parties do not dispute that consumers' decision-making process for purchasing vodka involves multiple factors in addition to the alleged misrepresentation.

capable of classwide proof, based on the testimony of an expert who "designed a regression model comparing actual cable prices in the Philadelphia DMA with hypothetical prices that would have prevailed but for petitioners' allegedly anticompetitive activities." *Id.* at 31-32.  The expert's model did not, however, "isolate damages resulting from any one theory of antitrust impact." *Id.* at 32.  On appeal from an affirmance in the Third Circuit, the Supreme Court reversed the certification decision because of the model's "inability to bridge the differences between supra-competitive prices in general and supra-competitive prices attributable to the deterrence of overbuilding." *Id.* at 38.

Thus, at the class certification stage, *Comcast* instructs that "a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class's asserted theory of injury." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015).  In other words, "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory.  If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *Comcast*, 569 U.S. at 35. "Calculations need not be exact . . . but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case." *Id.* (citations omitted).  Moreover, while a plaintiff "does not need to 'implement' or 'test' his methodology at the class certification stage, he must still provide sufficient detail about the proposed methodology to permit a court to determine whether the methodology is suitable to the task at hand." *Weiner*, 2010 WL 3119452, at *9, 2010 U.S. Dist. LEXIS 79647, at *27.

Here, Plaintiff asserts that three methodologies can be used to show an injury and calculate damages on a class-wide basis and that each is linked to Plaintiff's theory of liability—that class members paid a price premium for Tito's vodka based on the misleading "handmade representation." (Dkt. No. 69-1, pp. 24-26; Dkt. No. 107, pp. 8-11). To calculate a price premium, Plaintiff points to the comparator model used by Coffey and the two models identified by Krosnick, conjoint analysis and hedonic regression. For the most part, Defendant does not specifically challenge the efficacy of these models, but rather argues that Plaintiff "has failed to show any basis for determining that there was in fact a price premium—much less one that can be determined for each class member." (Dkt. No. 87, p. 26). Defendant cites to the opinion of liquor store owner Nolletti, that Tito's "readily competes with more expensive imports and 'status symbol' vodkas." (*Id.*, pp. 26-27). Defendant also notes that Plaintiff's experts did not consider consumers' perceptions of Tito's quality. (*Id.*, p. 27 n. 15).[22] Thus, Defendant suggests that "[t]here would be no way to calculate a price premium without reference to the particular purchasing circumstances of each class member." (*Id.*, p. 29). The Court will discuss these arguments, as they apply to the models proposed by Plaintiff, in turn.

### a.  Comparator Model

In some cases, "[c]alculating a price premium can be as simple as computing the difference between the cost of the second best product in the product class (without a deceiving label) and the cost of the product at issue (with the label)." *Goldemberg*, 317 F.R.D. at 394. Plaintiff's expert Coffey attempted this sort of analysis, comparing Tito's prices to Smirnoff and

---

[22] Plaintiff himself testified that he liked Tito's better than several high-end vodkas, and thought it was reasonably priced compared to them. (Dkt. No. 92-1, pp. 100-01). Once Plaintiff started buying Tito's, he did not buy any other brand of vodka. (*Id.*, p. 93).

46

Skyy, based on his opinion that they shared similar characteristics.  However, the only significant characteristic he suggests is that all three vodkas are corn-based.  Defendant argues that there is no basis for Coffey's assumption that consumers "actually differentiate among vodka brands according to the source material used to make the vodka."  (Dkt. No. 89-1, p. 5). Indeed, the fact that Skyy and Smirnoff are corn based is not even disclosed on their bottles. (Dkt. No. 92-1, p. 571).  Defendant also argues that "there has been no showing that these [vodkas] are of comparable quality to Tito's."  (Dkt. No. 87, p. 26).  Coffey admittedly did not consider other characteristics such as whether Smirnoff and Skyy are gluten-free like Tito's or have comparable quality ratings.  (Dkt. No. 92-1, pp. 571-72).[23]

As Defendant argues, and Liska and Nolletti point out, Plaintiff's comparator model falls short because Coffey has not identified an "appropriate benchmark product."  (Dkt. No. 87, p. 26).  Without an adequate basis for comparison (sharing most of Tito's other key attributes), Coffey cannot isolate the premium associated with the "handmade representation."  Accordingly, Plaintiff has not shown that the proposed comparator model may be used to measure damages tied to the class's theory of injury.  *See Weiner*, 2010 WL 3119452, at *7, 2010 U.S. Dist. LEXIS 79647, at *23 (rejecting expert's "yardstick approach" to "compare the price of products labeled 'All Natural' to similar products which do not have 'All Natural' labeling," where, *inter alia*, the expert did "not explain how his approach would isolate the impact of the 'All Natural' labeling from the other factors that purportedly affect the price of Snapple and its competitors"); *cf. Ebin*, 297 F.R.D. at 571-72 (finding that price premium damages could be measured for

---

[23] Furthermore, despite evidence that Tito's readily competes with more expensive imports, Coffey testified that he excluded higher-end imported vodkas from comparison based on his "personal gut call."  (Dkt. No. 92-1, p. 569).

allegedly misleading "100% Pure Olive Oil" product by calculating the difference between the market price of 100% olive oil and the market price of the less expensive olive-pomace oil).

### b.  Conjoint Analysis

Krosnick explained that a conjoint analysis could be performed to measure damages in this case by conducting the sort of survey he did for materiality, but instead of asking about consumers' perceptions of quality, he would ask about their willingness to buy a vodka product with the "handmade representation" versus another vodka product with the corrective statement about the vodka being made in "massive buildings containing ten floor-to-ceiling stills and bottling 500 cases an hour." (*See* Dkt. No. 116, p. 60).  Krosnick further states that "each respondent will be randomly assigned to be offered the bottle at one of various different prices surrounding the conventional retail prices of Tito's vodka." (*Id.*).  With the survey results, Krosnick states that "it will be possible to compute the average willingness to pay for the vodka when told Tito's claims about the manufacturing process, and the average willingness to pay for the vodka when told how the vodka is in fact manufactured." (*Id.*).  "The difference between these two averages will constitute the price premium and can be described as a percentage: the percent less that consumers pay for the vodka as the result of being told about the actual manufacturing process employed by Tito's." (*Id.*).  Assuming the data shows a percent discount, Krosnick opines that he could "then calculate the amount of overpayment by consumers for Tito's vodka in New York during the class period using the number of units of Tito's sold then (which presumabl[y] the manufacturer knows) and the retail prices paid by consumers for those units during that time." (*Id.*, p. 61).

48

Plaintiff asserts that this conjoint analysis "is directly linked to the theory of liability in this case because it shows what percentage less consumers will pay for Tito's when they are informed about the actual mass-production manufacturing process Tito's uses," which serves to "isolat[e] the amount directly attributable to the false 'handmade' representation." (Dkt. No. 107, p. 9). However, this model lacks sufficient detail to permit the Court to determine whether it satisfies *Comcast* and is suitable to the task at hand. First, it is not clear whether Krosnick proposes to use the actual Tito's vodka product in the conjoint analysis or a generic vodka product with same "handmade representation." The difference may be important to the extent that survey respondents value the Tito's brand name and/or associated quality. In other words, some respondents may choose to buy Tito's vodka, even with the corrective statement, based on their perception and/or past experience with Tito's. A conjoint analysis with two purely hypothetical products is too detached from the facts of this case to measure damages tied to Plaintiff's theory of liability. *See Ault v. J.M. Smucker Co.*, 310 F.R.D. 59, 67 (S.D.N.Y. 2015) (rejecting conjoint analysis where the plaintiff's expert only "proposes to ask some unspecified subsection of . . . customers what they would pay for a hypothetical Crisco product").

Second, Krosnick has not sufficiently explained how he would use real-world retail pricing and sales data to calculate the alleged price premium and actual damages for the class. Krosnick's description of the proposed process is vague and lacks the sort of step-by-step detail necessary to evaluate whether the methodology is workable here. Indeed, Krosnick devotes only three paragraphs (in his 111 paragraph second report) to conjoint analysis. While Krosnick need not test or implement the model at this stage, he must provide enough information to demonstrate its potential application to this case and Plaintiff's theory of liability. Krosnick's skeletal

49

analysis falls short.[24]  Accordingly, Plaintiff has failed to show that the proposed conjoint

analysis model may be used to measure damages tied to the class's theory of injury.  *See Ault*,

310 F.R.D. at 67 (finding that the proposed conjoint analysis model was not consistent with the

plaintiff's price premium theory of liability "because it makes no attempt to calculate the amount

that consumers actually overpaid due to the 'All Natural' label" using the product's "actual

pricing and sales data"); *Weiner*, 2010 WL 3119452, at *7, 2010 U.S. Dist. LEXIS 79647, at *22

(rejecting the plaintiff's expert's methods for determining the purported price premium

attributable to Snapple's "All Natural" labeling where, among other things, his "bare-bones

report provides no details concerning the significant conceptual, implementation, or data issues

that would be encountered if his two approaches were adopted").

### c.  Hedonic Regression

According to Krosnick, "hedonic regression is a statistical procedure that can be applied

to data on the sales of products in a category to assess the impact of features of those products on

purchasing behavior."  (Dkt. No. 116, p. 1813).  Krosnick's proposed hedonic regression model

would analyze "data on purchases of all vodkas in New York during the class period" in order to

"predict the number of bottles purchased and the prices paid for the vodkas."  (*Id.*, p. 61).  "The

predictors in the regressions would be the attributes of the bottles: the amount of vodka provided,

the ingredients used, flavoring, and other attributes, such as whether the vodka was hand-made in

small batches."  (*Id.*).  "The resulting coefficient estimates would gauge the impact of making

---

[24] Notably, Krosnick was not originally offered as a damages expert in this case, and Plaintiff's motion for class certification did not rely on his opinions as to damages.  (*See* Dkt. No. 69-1, pp. 25-26).  Those opinions are tacked on to the end of his second report, which was submitted with Plaintiff's reply in further support of the class motion. (*See* Dkt. Nos. 107, 116).

that latter claim on the price paid, holding constant all other features of the vodkas." (*Id.*).

Krosnick further explained the analysis as follows:

> So we would begin with information about how many of each of these, let's say, a hundred different types of vodka bottles were sold at what prices during this time period, and then we can conduct a regression that is predicting the sales outcomes based upon the features on the assumption that, as price goes up, in general, willingness to pay should go down, holding all other features constant. As various features of the product change, that may increase or decrease purchasing of the product.
>
> . . . .
>
> And one of the regression coefficients to emerge from hedonic regression would be the coefficient for the handmade claim. And, in essence, what that assesses is how much more money and how much more purchasing occurred for vodka bottles that made the claim of handmade versus the ones that did not make that claim.

(*Id.*, pp. 1814-15). Krosnick opined that "[i]f the coefficient is statistically significant and positive, its magnitude indicates how much more consumers paid for Tito's vodka during the class period due to the allegedly false claim about its manufacturing process." (*Id.*, p. 61).

Although hedonic regression analysis has been proposed and approved in some product labeling class actions, Krosnick's proposed model again lacks sufficient detail to permit the Court to determine whether it satisfies *Comcast* and is suitable to the task at hand. Critically, Krosnick makes little attempt to identify a relevant set of product attributes to plug into his hedonic regression model. Rather, he offers a few suggestions—the amount of vodka provided, the ingredients used, flavoring, whether the vodka was hand-made in small batches—and indicates that he might use some other attributes as yet undetermined. (Dkt. No. 116, p. 61). But absent from this tentative list is a key attribute identified by Defendant – product quality. Krosnick has not explained how a hedonic regression model can isolate the effect of the "handmade representation" in this case while accounting for other relevant product attributes,

including product quality.[25]  Krosnick's model requires, at a minimum, some metric to account

for product quality.  His analysis is once again too superficial to support the proposed model.[26]

Consequently, Plaintiff has also failed to show that the proposed hedonic regression model may

be used to measure damages tied to the class's theory of injury.  *See In re Scotts EZ Seed Litig.*,

304 F.R.D. at 413 ("Courts routinely reject price premium methodologies under *Comcast* when

the proposed methodologies do not attempt to isolate the premium due only to the allegedly

misleading marketing statement. . . . These courts correctly point out consumers may pay a

higher price for a product for many reasons that have nothing to do with specific advertising

claims, including brand loyalty and product quality.") (internal citations omitted); *see also*

*Bickerstaff v. Vassar College*, 196 F.3d 435, 450 (2d Cir. 1999), *as amended on denial of reh'g*

(Dec. 22, 1999) (recognizing that a regression analysis must account for "the major factors" that

are relevant in the case); *cf. In re Elec. Books Antitrust Litig.*, No. 11 MD 2293, 2014 WL

1282293, at *25, 2014 U.S. Dist. LEXIS 42537, at *76 (S.D.N.Y. Mar. 28, 2014) (finding

hedonic regression model reliable and granting class certification where, among other things, the

expert "constructed a sophisticated hedonic pricing model" based on numerous independent

factors that might influence an e-book's price).

### iii.   Summary

Overall, after carefully considering the key issues in this case, the Court finds that

common issues do not predominate over individual ones.  For Plaintiff's GBL § 349 claim,

---

[25] In contrast, many of the cases approving hedonic regression damages models involved products with a limited number of relevant attributes, not necessarily including consumers' perception of product quality.  *See, e.g., Belfiore*, 311 F.R.D. at 70 (discussing personal wiping products marketed as "flushable").

[26] Krosnick devotes only one paragraph to hedonic regression in his second report and his deposition testimony is mostly theoretical and lacks sufficient detail to explain his proposed analysis.  (*See* Dkt. No. 116, pp. 1813-16).

although materiality may be proven with class-wide evidence, the issues of injury and damages will devolve into individualized inquiries because Plaintiff has failed to propose a sufficiently-detailed and suitable model to measure the alleged price premium for Tito's vodka due to the "handmade representation."  *See Hughes*, 317 F.R.D. at 356 ("Plaintiffs have not demonstrated that damages are calculable on a class-wide basis and therefore individualized questions of fact or law predominate over common questions and Rule 23(b)(3)'s predominance requirement is not satisfied.").  For Plaintiff's intentional misrepresentation claim, the issues of reliance and causation also predominate because individualized proof is necessary as to the purchasing decision of each class member, i.e. why they bought Tito's vodka.  *See Kurtz*, 2017 WL 1155398, at *81, 2017 U.S. Dist. LEXIS 44576, at *174 ("Kurtz's negligent misrepresentation and breach of warranty claims require proof that he relied on the 'flushable' representation on the defendants' packages, and that that reliance caused his injury. . . . For these non-statutory claims, common questions of law or fact do not predominate over individual questions because individualized proof is necessary to demonstrate each purchaser's reliance on defendants' alleged misrepresentations.").

Accordingly, Plaintiff has failed to satisfy the requirements for class certification under Rule 23(b)(3).[27]

## V.    CONCLUSION

For these reasons, it is

---

[27] Since the Court finds that Plaintiff has failed to satisfy the predominance requirement of Rule 23(b)(3), the Court need not address whether Plaintiff has also demonstrated the superiority of class adjudication.  *See Hughes*, 317 F.R.D. at 356 (E.D.N.Y. 2016); *see also Sykes v. Mel S. Harris and Associates LLC*, 780 F.3d 70, 82 (2d Cir. 2015) (noting that factors listed in Fed. R. Civ. P. 23(b)(3)(A)-(D) "more clearly implicate the superiority inquiry").

**ORDERED** that Plaintiff's Motion for Class Certification (Dkt. No. 69) is **DENIED**; and it is further

**ORDERED** that Defendant's Motion to Strike the Declaration of Donald Coffey (Dkt. No. 89) is **DENIED**; and it is further

**ORDERED** that Defendant's Motion to Strike the Report of Dr. Jon A. Krosnick (Dkt. No. 90) is **DENIED**; and it is further

**ORDERED** that Defendant's Motion to Strike the Declaration of Michael Meyerson (Dkt. No. 91) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's Motion to Strike the Declaration of Peter Reidhead (Dkt. No. 104) is **DENIED**; and it is further

**ORDERED** that Plaintiff's Motion to Strike the Declaration of Nicole Liska (Dkt. No. 105) is **DENIED**; and it is further

**ORDERED** that Plaintiff's Motion to Strike the Declaration of Ray Nolletti (Dkt. No. 106) is **DENIED**; and it is further

**ORDERED** that Plaintiff's Motion to Strike portions of the testimony of Sarah Butler (Dkt. No. 112) is **DENIED**; and it is further

**ORDERED** that Plaintiff's Motion to Strike portions of the testimony of Michael Rappeport (Dkt. No. 113) is **DENIED**.

**IT IS SO ORDERED.**

September 27, 2017
Syracuse, New York

Brenda K. Sannes
U.S. District Judge

54